**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GURU NANAK SIKH SOCIETY OF
YUBA CITY,
              *Plaintiff-Appellee,*

              v.

COUNTY OF SUTTER; CASEY KROON;
DENNIS NELSON; LARRY MUNGER;
DAN SILVA,
              *Defendants-Appellants.*

No. 03-17343

D.C. No.
CV-02-01785-LKK

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior Judge, Presiding

Argued and Submitted
October 17, 2005—San Francisco, California

Filed August 1, 2006

Before: Dorothy W. Nelson, Johnnie B. Rawlinson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## COUNSEL

Jeffrey T. Melching & John A. Ramirez, Rutan & Tucker, LLP, Costa Mesa, California, for the defendants-appellants.

Michael R. Barrette, Yuba City, California, for the plaintiff-appellee.

R. Alexander Acosta, Jessica Dunsay Silver, Eric W. Treene & Sarah E. Harrington, Department of Justice, Civil Rights Division, Washington, D.C., for intervenor and amicus United States.

Jennifer B. Henning, Sacramento, California, for amici California State Association of Counties and the League of California Cities in support of the defendants-appellants.

Gibson, Dunn & Crutcher, LLP, New York, New York, for amici The Anti-Defamation League, et al.

Roman P. Storzer, Anthony Picarello Jr. & Derek L. Gaubatz, The Becket Fund for Religious Liberty, Washington, D.C., in support of the plaintiff-appellee.

## OPINION

BEA, Circuit Judge:

We must decide whether a local government's denial of a religious group's application for a conditional use permit to construct a temple on a parcel of land zoned "agricultural" constituted a "substantial burden" under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc, *et seq.*, and if we find that the denial was a substantial burden, whether RLUIPA is constitutional.

We find that the County[1] imposed a substantial burden on Appellee Guru Nanak Sikh Society of Yuba City's ("Guru Nanak's") religious exercise under RLUIPA because the stated reasons and history behind the denial at issue, and a previous denial of Guru Nanak's application to build a temple on a parcel of land zoned "residential," to a significantly great extent lessened the possibility of Guru Nanak constructing a temple in the future. We also decide that the County did not assert, much less prove, compelling interests for its action; last, we find the relevant portion of RLUIPA is a permissible exercise of Congress's remedial power under Section Five of the Fourteenth Amendment.

Accordingly, we affirm the district court's order that granted summary judgment for Guru Nanak, invalidated the County's denial of Guru Nanak's application to build a new temple, and enjoined the County to approve and grant Guru Nanak's conditional use permit immediately, subject only to conditions to which Guru Nanak had previously agreed.

## I.   Facts and Background[2]

---

[1]This opinion refers to Appellants County of Sutter, Casey Kroon, Dennis Nelson, Larry Munger, and Dan Silva, in their official capacities as County Supervisors, collectively as "the County."

[2]The facts in this case are not disputed. This summary draws extensively from the district court opinion, *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140 (E.D. Cal. 2003).

## A. *Denial of Guru Nanak's First CUP Application*[3]

Guru Nanak is a non-profit organization dedicated to fostering the teachings and practices of the Sikh religion. In 2001, Guru Nanak attempted to obtain a conditional use permit (CUP)[4] for the construction of a Sikh temple—a *gurudwara*—on its 1.89-acre property on Grove Road in Yuba City ("the Grove Road property"). The proposed use included about 5,000 square feet dedicated to an assembly area and related activities. The proposed temple site would have held religious ceremonies for no more than seventy-five people at a time. The Grove Road property was in an area designated for low-density residential use (R-1), intended mainly for large lot single family residences; churches and temples are only conditionally permitted in R-1 districts, through issuance of a CUP.

The Sutter County Planning Division, part of the County Community Services Department, issued a report recommending that the Planning Commission grant a CUP for the

---

[3]The details of Guru Nanak's first CUP application were not included in the record on appeal. Therefore, we rely on the district court's summary of the relevant facts, which facts are not disputed by the parties.

[4]The Sutter County Zoning Code describes the purpose of utilizing use permits for certain proposed uses of land:

> The County realizes that certain uses have operational characteristics that, depending on the locations and design, may have the potential to negatively impact adjoining properties and uses. Such uses therefore require a more comprehensive review and approval procedure in order to evaluate and mitigate any potentially detrimental impacts. Use permits, which may be revocable, conditional or valid for a term period, may be issued by the Planning Commission for any of the uses or purposes for which such permits are required or permitted by the terms of this Chapter. Guarantees to ensure compliance with the terms and conditions may be required by the Commission.

Sutter County Zoning Code § 1500-8210 (May 2002). *See infra* Part I.C. for further discussion of CUPs.

Grove Road property. The report stated that while the permit presented potential conflicts with established residences in the area, the conflicts could be minimized by specifically recommended conditions that would be consistent with the General Plan of Sutter County. However, at a public meeting, the Planning Commission voted unanimously to deny the CUP. The denial was based on citizens' voiced fears that the resulting noise and traffic would interfere with the existing neighborhood. Following the Commission's denial, Guru Nanak began searching for a different parcel of property for the proposed temple.

## B.   *Denial of Guru Nanak's Second CUP Application*

In 2002, Guru Nanak acquired the property at issue in this case, a 28.79-acre parcel located on George Washington Boulevard in an unincorporated area of the County,[5] to build a temple there. The site is zoned "AG" (general agricultural district) in the Sutter County Zoning Code. As in R-1 districts, churches and temples are only conditionally permitted in AG districts, through issuance of a CUP. The parcel includes a walnut orchard and an existing 2,300 square foot single family residence, which Guru Nanak proposed to convert into a Sikh temple by increasing the size of the building by approximately 500 square feet. All of the surrounding properties have identical zoning designations and have orchards. The nearest residence to the property is at least 200 feet north of the parcel's northern boundary. The residence to be converted into the temple is located 105 feet south of that northern boundary.

---

[5]This parcel was within the "sphere of influence" of Yuba City. In other words, it was not officially yet within the City's borders, but the parcel was in a delineated area which will probably become part of the city as the urban center expands and takes over agricultural land. When land is within a city's sphere of influence, "comprehensive land use planning . . . [is] conducted by [the applicable] city in cooperation and coordination with the County." Sutter County General Plan, Policy Document, at v (November 25, 1996).

Another Sikh temple already exists on a ten-acre parcel of land zoned "agricultural" located next to Bogue Road, less than a mile southeast from the proposed temple's parcel. Within Yuba City's sphere of influence, the Bogue Road Sikh temple is surrounded by land zoned "agricultural."

Guru Nanak filed an application for a CUP to build a temple limited to approximately 2,850 square feet on the proposed site. The proposed use of the property was for a Sikh temple, assembly hall, worship services, and weddings. As with the Grove Road property, the proposed facility was intended to accommodate religious services of no more than seventy-five people at a time. Various county and state departments reviewed Guru Nanak's application and added a variety of conditions regarding the environmental impact of the proposed use including a twenty-five foot "no development" buffer along the north side of the property, a requirement that ceremonies remain indoors, and required landscaping.

Guru Nanak had to accept these conditions to receive the Planning Division's recommendation to the Planning Commission. The Planning Division issued a "mitigated negative declaration" (*i.e.* that the proposed temple would not create a significant environment impact) because "although the proposed [temple] could have a significant impact on the environment[,] . . . the recommended mitigation measures would reduce the possible impacts to a less-than-significant level." The Planning Division cited the temple's maximum attendance of 75 people, minor building conversion, and stipulated mitigation measures as reasons for finding a less-than-significant impact on the environment.

The Planning Commission held a public meeting to consider Guru Nanak's permit application. A member of Guru Nanak testified that while its previous application was for a 1.9-acre lot in a residential area, the subject application pertained to a 28.8-acre lot that did not border anyone's front or

back yard. He also stated that Guru Nanak would accept all the Planning Division's proposed conditions on the land's use. Various potential neighbors spoke against the proposed temple, complaining mainly that the temple would increase traffic and noise, interfere with the agricultural use of their land, and lower property values. The Commission approved the application 4-3, subject to the conditions required by the Planning Division and stipulated to by Guru Nanak, with the commissioners echoing the reasoning voiced by both sides.

Several neighbors filed timely appeals to the Sutter County Board of Supervisors. The Planning Division filed another report in response to the appeals, addressing the specific complaints of the concerned neighbors and continuing to recommend approval of Guru Nanak's CUP application. Subject to revised mitigation conditions including an expanded one-hundred foot setback, the Planning Division found that the proposed temple's effect on neighbors' pesticide spraying, nearby traffic, and noise levels would be minimal.

The Board of Supervisors held a public hearing on the appeals. People attending the hearing reiterated claims regarding effects upon the agricultural use of surrounding land, traffic, and property values. In addition, several people complained that the initial plan for a seventy-five person temple was only a starting point for more ambitious facilities and this piece-meal approval process violated the California Environmental Quality Act (CEQA).

The four-member Board of Supervisors unanimously reversed the Planning Commission's approval and denied Guru Nanak's application. Supervisor Kroon flatly rejected the project based on the "right to farm": the property had been agricultural and should remain so. He argued that long-time farmers should not be affected by someone who wishes to change the use of the property. Supervisor Nelson stated that he was concerned that Guru Nanak's proposed use "was too far away from the city" and would not promote orderly

growth. He commented that such development is detrimental to the surrounding agricultural uses and that Guru Nanak should locate its church nearer to his and other existing churches. Supervisors Munger and Silva agreed that the proposed temple site's separation from existing infrastructure, termed "leapfrog development," was a poor idea and denied the application on that ground.

C.  *Local Land Use Law*

The Sutter County General Plan is a long-term guide for physical development of land within the County. The Plan empowers the County's Community Services Department to ensure that "new development adjacent to agricultural areas be designed to minimize conflicts with adjacent agricultural uses." Policy Document, at 16. The Plan disfavors development not contiguous to areas currently designated for urban or suburban uses—leapfrog development—because it "has the potential to create land use conflicts and, in most instances, make[s] the provision of services more difficult." *Id.* at 13.

The Sutter County Zoning Code designates twenty-two types of districts. Within each of these districts, the Code categorizes uses as "permitted" as a matter of right, uses that require a "zoning clearance," or uses that require a use permit. Zoning clearance uses need only the review and approval of the Community Services Director. Conditional use permit uses require a more comprehensive review through the Sutter County Planning Commission, and require a public hearing. A church must apply for a CUP to locate within any district available to it. Six of the twenty-two types of districts are made available to churches through the Zoning Code: general agricultural (AG); food processing, agricultural and recreation combining (FPARC); one-family residence (R-1), two-family residence (R-2), neighborhood apartment (R-3), and general apartment (R-4).

D.   *The Decision Below*

The district court granted summary judgment for Guru Nanak because it concluded the County substantially burdened Guru Nanak's religious exercise, and that the County did not proffer evidence of compelling interests to justify such burden. *Guru Nanak Sikh Soc'y of Yuba City*, 326 F. Supp. 2d at 1152-54. The district court reasoned that "[t]o meet the 'substantial burden' standard, the governmental conduct being challenged must *actually inhibit* religious activity in a concrete way, and cause more than a mere inconvenience." *Id.* at 1152. Applying its definition of the substantial burden standard to the facts, the district court held that "the denial of the use permit, particularly when coupled with the denial of [Guru Nanak's] previous application, actually inhibits [Guru Nanak's] religious exercise." *Id.* The court also found that Congress did not overstep its constitutional bounds under Section Five of the Fourteenth Amendment when enacting RLUIPA because the statute targets documented religious discrimination. *Id.* at 1156-61. The court rejected the County's CEQA claim because the County's Planning Division had already found that the proposed temple, subject to stipulated mitigation measures, would create "a less-than-significant level" of environmental impacts. *Id.* at 1148-49. Accordingly, the district court invalidated the County's denial of Guru Nanak's CUP application and enjoined the County to approve immediately the CUP. *Id.* at 1161-63.

## II.   Analysis

We have jurisdiction under 28 U.S.C. § 1291. This court reviews *de novo* the district court's order granting summary judgment. *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1029 (9th Cir. 2004). In reviewing the district court decision, "we must determine, viewing the evidence in the light most favorable to the nonmoving party, 'whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.' "

*Id.* at 1029-30 (quoting *Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir. 2002)).[6]

We decide that the County made an individualized assessment of Guru Nanak's CUP, thereby making RLUIPA applicable, and that the County's denial of Guru Nanak's CUP application constituted a substantial burden, as that phrase is defined by RLUIPA. Because RLUIPA applies to this case, we address RLUIPA's constitutionality pursuant to Section Five of the Fourteenth Amendment, and decide that RLUIPA is a congruent and proportional exercise of congressional power pursuant to the Fourteenth Amendment.

A.   *Statutory Claim under RLUIPA*

RLUIPA is Congress's latest effort to protect the free exercise of religion guaranteed by the First Amendment from governmental regulation.[7] In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990), the Supreme Court decided that the Free Exercise Clause of the First Amendment "does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct." *Cutter v. Wilkinson*, 125 S. Ct. 2113, 2118 (2005).

In 1993, Congress enacted the Religious Freedom and Restoration Act of (RFRA) in response to the Supreme Court's decision in *Smith*. RFRA "prohibit[ed] '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government [could] demonstrate the burden '(1)

---

[6]Because the material facts are undisputed, we are left to decide whether the district court correctly applied RLUIPA to those facts, and whether RLUIPA passes constitutional scrutiny.

[7]The provisions of the First Amendment apply to state and local government regulation. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 n.4 (2004).

[was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest.' " *City of Boerne v. Flores*, 521 U.S. 507, 515-16 (1997) (second and third alterations in original) (quoting 42 U.S.C. § 2000bb-1). In *City of Boerne*, though, the Supreme Court invalidated RFRA, deciding that it was an unconstitutional exercise of congressional power pursuant to Section Five of the Fourteenth Amendment because of a "lack of proportionality or congruence between the means adopted and the legitimate end to be achieved." *Id.* at 533.

Congress enacted RLUIPA in response to the constitutional flaws with RFRA identified by *City of Boerne.* "RLUIPA 'replaces the void provisions of RFRA[,]' and prohibits the government from imposing 'substantial burdens' on 'religious exercise' unless there exists a compelling governmental interest and the burden is the least restrictive means of satisfying the governmental interest." *San Jose Christian*, 360 F.3d at 1033-34 (quoting *Wyatt v. Terhune*, 315 F.3d 1108, 1112 (9th Cir. 2003) (citation omitted). To avoid RFRA's fate, Congress wrote that RLUIPA would apply only to regulations regarding land use and prison conditions. *See Cutter*, 125 S. Ct. at 2118.

**[1]** RLUIPA applies only if one of three conditions obtain: (1) If the state "program or activity receives Federal financial assistance," 42 U.S.C. § 2000cc(2)(A), implicating congressional authority pursuant to the Spending Clause; (2) if the substantial burden imposed by local law "affects . . . [or] would affect, commerce with foreign nations, among the several States, or with Indian tribes," *id.* § 2000cc(2)(B), implicating congressional power pursuant to the Commerce Clause; (3) or, as Guru Nanak argues here, if "the substantial burden is imposed in the *implementation of a land use regulation* or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, *individualized*

*assessments* of the proposed uses for the property involved," 42 U.S.C. § 2000cc(2)(C) (emphasis added).

### 1.   Individualized Land Use Assessments

Before we apply the terms of RLUIPA, of course, we first must determine if RLUIPA even applies, by examining whether the actions of the County are "individualized assessments of the proposed uses for the property involved." *Id.* The County argues that its denial of Guru Nanak's second CUP application falls outside the legislative scope of RLUIPA because its use permit process is a neutral law of general applicability. However, the plain meaning of § 2000cc(2)(C), quoted above, belies this contention. RLUIPA applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use.[8]

The Sutter County Zoning Code does not permit churches as a matter of right in any of the six types of zoned areas available for church construction. Rather, an entity intending to build a church must first apply for a CUP and be approved by the County. The Zoning Code states, "The County realizes that certain uses . . . may have the potential to negatively impact adjoining properties and uses. Such uses therefore require a more comprehensive review and approval procedure in order to evaluate and mitigate any potentially detrimental impacts." § 1500-8210. The Zoning Code also outlines how the Sutter County Planning Commission, which has original jurisdiction over such use applications, should determine whether to approve or reject an application:

The Planning Commission may approve or condi-

---

[8]The Sutter County Zoning Code undeniably is a "system of land use regulations" within the meaning of RLUIPA because it is a system of "zoning law[s] . . . that limits or restricts a claimant's use or development of land . . . ." 42 U.S.C. § 2000cc-5.

tionally approve a use permit if it finds that the establishment, maintenance, or operation of the use or building applied for will or will not, *under the circumstances of the particular case*, be detrimental to the health, safety, and general welfare of persons residing or working in the neighborhood of such proposed use, or be detrimental or injurious to property and improvement in the neighborhood or to the general welfare of the County. Additionally, the Commission shall find that the use or activity approved by the use permit is consistent with the General Plan [of Sutter County].

§§ 1500-8216 (emphasis added). The County Board of Supervisors reviews the Planning Commission's conditional use decisions "de novo and all applications, papers, maps, exhibits and staff recommendations made or presented to the Planning Commission may be considered." *Id.* § 1500-312(f). The Sutter County Zoning Code directs the Planning Commission and the Board of Supervisors to "implement [its] system of land use regulations [by making] individualized assessments of the proposed uses of the land involved." 42 U.S.C. § 2000cc.

**[2]** By its own terms, it appears that RLUIPA does not apply directly to land use regulations, such as the Zoning Code here, which typically are written in general and neutral terms. However, when the Zoning Code is applied to grant or deny a certain use to a particular parcel of land, that application is an "implementation" under 42 U.S.C. § 2000cc(2)(C). *See Kaahumanu v. County of Maui*, 315 F.3d 1215, 1220-23 (9th Cir. 2003) (concluding in a RLUIPA case that a similar permit process resulted in an administrative, rather than legislative, action because it "was based on the circumstances of the particular case and did not effectuate policy"); *Freedom Baptist Church of Delaware County v. Twp. of Middletown*, 204 F. Supp. 2d 857, 868-69 (E.D. Pa. 2002) ("No one contests that zoning ordinances must by their nature impose indi-

vidual assessment regimes. That is to say, land use regulations through zoning codes necessarily involve case-by-case evaluations of the propriety of proposed activity against extant land use regulations.").[9] RLUIPA therefore governs the actions of the County in this case.

2. Substantial Burden Under RLUIPA

[3] We next turn to the issue whether the County's denial of Guru Nanak's CUP application substantially burdened its religious exercise within the meaning of RLUIPA.

The statute states, in relevant part:

(a) Substantial burdens

(1) General rule

No government shall impose or implement a land use regulation in a manner that imposes a *substantial burden on the religious exercise* of a person, includ-

---

[9]While the statutory text is dispositive on this issue, for those who seek to interpret statutes by reference to the legislators' stated purposes, RLUIPA's legislative history confirms that the County's procedure for approving a CUP application constitutes an individualized assessment. In explaining the need for RLUIPA, Senators Hatch and Kennedy, sponsors of the bill, noted, "Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the *highly individualized and discretionary processes of land use regulation.* . . . [O]ften, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.' " 146 Cong. Rec. S774-01 (daily ed. July 27, 2000) (emphasis added). Sutter County's Zoning Code implementation process is individualized and discretionary. In fact, the Board of Supervisors in this case summarized the predominant reason for its denial of Guru Nanak's application by concluding that "the proposed uses [are] inconsistent with existing uses within the area"—an echo of the broad and discretionary response that RLUIPA's sponsors cited as a need for the statute.

ing a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

**(A)** is in furtherance of a compelling governmental interest; and

**(B)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc (emphasis added). Guru Nanak bears the burden to prove the County's denial of its application imposed a substantial burden on its religious exercise. *Id.* § 2000cc-2(b).

The Supreme Court's free exercise jurisprudence is instructive in defining a substantial burden under RLUIPA. The Supreme Court has held that various unemployment compensation regulations imposed a substantial burden on adherents' religious exercise, and thereby were subject to strict scrutiny, because the regulations withheld benefits based on adherents' following their religious tenets. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963).[10,11] This choice between unemployment benefits or religious duties imposed a burden because it exerted "substantial pressure on an adherent to modify his

---

[10]In *Sherbert*, the Court held that the Free Exercise Clause protects a jobless individual from losing unemployment compensation because she chooses to obey a central tenet of her faith: not to work on the Sabbath (Saturday). *Sherbert*, 374 U.S. at 403-09.

[11]Several of our sister circuit courts began their task of defining substantial burden by referring to these precedents. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004) ("We turn . . . to other instances in which courts have defined or discussed the term 'substantial burden.' "); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) ("*Civil Liberties*") ("RLUIPA's legislative history indicates that it is to be interpreted by reference to RFRA and First Amendment jurisprudence." (citing 146 Cong. Rec. S774-01 (July 27, 2000)).

behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (explaining that to trigger strict scrutiny under the First Amendment a governmental burden must have a "tendency to coerce individuals into acting contrary to their religious beliefs"). These cases demonstrate "that a 'substantial burden' must place more than an inconvenience on religious exercise." *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).

**[4]** Accordingly, interpreting RLUIPA, this court has held: "[F]or a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."[12] *San Jose Christian*, 360 F.3d at 1034 (quoting Merriam-Webster's Collegiate Dictionary 1170 (10th ed. 2002)). Applying *San Jose Christian*'s definition of a substantial burden to the particular facts here, we find the district court cor-

---

[12]The County argues that San Jose Christian instead defined the phrase "substantial burden" by reference to the Seventh Circuit opinion in *Civil Liberties* that adopted a narrower definition of the phrase. *Compare San Jose Christian*, 360 F.3d at 1035 ("Our holding is entirely consistent with the Seventh Circuit's recent ruling . . . [that] the City's regulations in this case do not render religious exercise *effectively impracticable*" (emphasis added)), *with Civil Liberties*, 342 F.3d at 761 ("We therefore hold that . . . a land-use regulation . . . imposes a substantial burden on religious exercise [if it] necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—*effectively impracticable*." (emphasis added)). We disagree with this understanding of *San Jose Christian*. After announcing its holding which defined the phrase "substantial burden," *San Jose Christian*, 360 F.3d at 1034, *San Jose Christian* referred to *Civil Liberties*, and then simply to note that *San Jose Christian* "is entirely consistent [with *Civil Liberties*]." *Id*. at 1035. Failure by San Jose Christian College to present a complete land use application can fail the more lenient "oppressive to a significantly great extent" test as well as the "effectively impracticable" test. That is the consistency; it does not mean the former case adopted the latter case's test.

rectly granted summary judgment for Guru Nanak. Most important to us the history behind Guru Nanak's two CUP application processes, and the reasons given for ultimately denying these applications, to a significantly great extent lessened the possibility that future CUP applications would be successful. *See Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 899-900 (7th Cir. 2005) ("*Saint Constantine*") (finding that, to prove a substantial burden under RLUIPA, a religious group need not "show that there was no other parcel of land on which it could build its church"). We need not and do not decide that failing to provide a religious institution with a land use entitlement for a new facility for worship necessarily constitutes a substantial burden pursuant to RLUIPA. At the same time, we do decide the County imposed a substantial burden here based on two considerations: (1) that the County's broad reasons given for its tandem denials could easily apply to all future applications by Guru Nanak; and (2) that Guru Nanak readily agreed to every mitigation measure suggested by the Planning Division, but the County, without explanation, found such cooperation insufficient.

The Zoning Code permits churches in six types of districts. Churches must apply for a CUP within any or all of the six available districts. Each of the district classifications available to churches is intended to provide an area for a distinct form of development.[13] The CUP application process is intended to ensure that a religious group's proposed property use conforms with the type of development that the particular district contemplates.

Guru Nanak initially applied for a CUP to construct a Sikh

---

[13]For instance, "the [General Agricultural] District is established to provide areas for general farming, low density uses, open spaces, and by use permit limited retail service uses which in the opinion of the Planning Commission support the local agricultural industry." Sutter County Zoning Code § 1500-1410.

temple on a 1.89-acre property in an R-1 (One Family Residence) District.[14] The Sutter County Community Services Department had recommended approval of the proposed use because mitigation measures, agreed to by Guru Nanak, would have minimized conflicts with surrounding land. Nevertheless, the County Planning Commission unanimously rejected the application, citing neighbors' complaints regarding increased noise and traffic.

Guru Nanak predictably responded to these voiced complaints by attempting to locate its temple on property far from residents who would be bothered by noise and traffic. The County's stated reasons for denying Guru Nanak's first application implied to Guru Nanak that it should not attempt to locate its temple in higher density districts (two-family residence, neighborhood apartment, general apartment, and the combining district) where nearby neighbors would be similarly bothered.[15]

---

[14]This district classification is intended to provide areas for low density residential development within an urban environment that has adequate services and amenities which will support a desirable and stable living environment." Sutter County Zoning Code § 1500-2210.

[15]Although one could argue that higher density districts—such as apartment and combining districts—are likely still available for Guru Nanak's temple because apartment dwellers are probably more noise tolerant than neighbors in a low density residential district, the County's land use law does not allow such a distinction. The Sutter County General Plan states that "[n]ot all land uses are equally affected by noise"; however, "residences of *all types*" are grouped together as being noise sensitive. Policy Document, at 71 (emphasis added). The Sutter County Zoning code characterizes apartments districts as residential under the General Plan, §§ 1500-2810, 1500-3110, and permits "one-family dwellings . . . when occupied or used by . . . persons employed on the premises" as of right in combining districts, § 1500-1730. Therefore, neighbors located in either two-family residence, apartment, or combining districts would be equally justified under the General Plan to complain about the noise created by a nearby proposed temple as neighbors located in low density residential districts. A Guru Nanak CUP application for a temple in any of these districts could be denied for the exact same broad reasons as its first CUP application.

Accordingly, Guru Nanak proposed a smaller temple, with the same seventy-five person capacity, on a much larger parcel of agricultural land.[16] The agricultural parcel left much more space between the temple and adjacent properties; that space mitigated the temple's noise and traffic impact on surrounding persons. Both the Community Services Department and the Planning Commission approved this second application because the parcel's size, along with additional setback and use conditions, adequately addressed the noise, traffic, and other complaints related to the temple's possible impact on surrounding agricultural uses.

[5] The County Board of Supervisors' denial of Guru Nanak's second application frustrated Guru Nanak's attempt to comply both with the reasons given for the County's first denial and the Planning Division's various requirements for Guru Nanak to locate a temple on land zoned "agricultural." The Board's primary reason for denying Guru Nanak's second application was that the temple would contribute to "leap-frog development." Although the Zoning Code conditionally permits churches and other non-agricultural activities within agricultural districts, the County could use its concern with leapfrog development effectively to deny churches access to all such land; a great majority of agriculturally zoned land near Yuba City is separated from existing urban development. Moreover, many other churches already exist on agriculturally zoned land,[17] including another Sikh temple located on Bogue

---

[16]During the public hearing at which the Sutter County Planning Commission approved Guru Nanak's second application, Commissioner Griffin commented, "We turned . . . down [Guru Nanak's first application] because the noise impact on the neighbors was going to be severe. And more or less told them that they needed to *find more acreage* to set up their facility, and they did that." (Emphasis added.)

[17]At the Planning Commission public hearing, Marie Carney, Guru Nanak's realtor in acquiring the subject property, stated, "[T]here [are] plenty of examples of churches having been built on ag[ricultural] land and they tend to be scattered throughout the community." Although Ms. Carney was not a neutral participant in this land use proceeding, her statement is nowhere disputed in the record.

Road less than a mile away from the proposed temple. The Bogue Road Sikh temple's parcel of land, like Guru Nanak's land, is surrounded by other agricultural parcels of land, to the extent such parcels are within Yuba City's sphere of influence. Hence, the County inconsistently applied its concern with leapfrog development to Guru Nanak.[18] At the very least, such inconsistent decision-making establishes that any future CUP applications for a temple on land zoned "agricultural" would be fraught with uncertainty. *See id.* at 901 (finding a substantial burden where a church's future efforts to locate another parcel of property or file new land use applications would result in "delay, uncertainty, and expense").

   **[6]** In denying the second CUP application, the Board of Supervisors disregarded, without explanation, the Planning Division's finding that Guru Nanak's acceptance of various mitigation conditions would make the proposed temple have a less-than-significant impact on surrounding land uses. We "cannot view [the denial of the second CUP application] 'in isolation'; [rather, it] 'must be viewed in the context of [Guru Nanak's permit process] history.' " *See Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 548 (S.D.N.Y. 2006) (quoting *Living Water Church of God v. Charter Twp. of Meridian,* 384 F. Supp. 2d 1123, 1134 (W.D. Mich. 2005)). In *Westchester Day School*, the district court found a substantial burden where the zoning board denied the religious day school's land use application despite the day school having "worked for over one-and-a-half years to address the [zoning board's] concerns and offered to make changes to, *inter alia,* parking, the size of [the proposed construction,] landscaping,

---

[18]Other earlier "leapfrog development" evidence was adduced. During the Planning Commission public hearing, Commissioner Dunn noted, "[Sutter County] just approved a development out on Township Road [in an area not contiguous with Yuba City limits] last year. Big huge development for residential occupation, . . . both planning commissions were against it, and still, passed the review to their supervisors. . . . I'm just pointing out things that I've seen that fly in the face of that comment [that the County attempts to avoid leapfrog development.]"

[the] enrollment cap[, and] a bus departure management plan to mitigate the traffic impact." *Id.*; *see also Living Water*, 384 F. Supp. 2d. at 1134 (finding a substantial burden where the Township denied the church's land use proposal after the church had "worked diligently and in good faith with the Township to address its concerns before submitting a revised . . . proposal"). Similarly, during both of its CUP application processes, Guru Nanak agreed to every mitigation condition the Planning Division found necessary to recommend the land entitlements. Regarding the second application in particular, Guru Nanak agreed to a host of conditions proposed specifically to allay the County's concerns with leapfrog development—including a one-hundred foot setback to allow for pesticide spraying, and that all its religious ceremonies be held indoors and limited to seventy-five people. Nevertheless, in denying the second application, the Board of Supervisors neither related why any of such mitigation conditions were inadequate nor suggested additional conditions that would render satisfactory Guru Nanak's application.

[7] While the Zoning Code conditionally permits churches in residential and higher density districts, noise and traffic concerns would likely preclude constructing any other proposed temple on a small parcel of land.[19] Likewise, Guru Nanak would understandably be hesitant to propose a temple on another large, agricultural parcel of land for fear that the County would yet again deny that application because of leapfrog development. Even if Guru Nanak were once again to follow the Planning Division's detailed requirements on mitigating impacts on nearby land, history shows such extensive efforts could very well be in vain. The net effect of the Coun-

_____

[19]During the Planning Commission public hearing, one complaining neighbor exemplified the perspective of many Sutter County residents that converted Guru Nanak's task of locating suitable property into a predicament: "[N]o family wants to live near a religious temple with all the excessive crowds, traffic, and noise which will increase with a future temple and [Guru Nanak's] proposal."

ty's two denials—including their underlying rationales and disregard for Guru Nanak's accepted mitigation conditions—is to shrink the large amount of land theoretically available to Guru Nanak under the Zoning Code to several scattered parcels that the County may or may not ultimately approve.[20] Because the County's actions have to a significantly great extent lessened the prospect of Guru Nanak being able to construct a temple in the future, the County has imposed a substantial burden on Guru Nanak's religious exercise.

Our decision contrasts with the facts present in *San Jose Christian,* where we found the plaintiff had not suffered a substantial burden because the city's actions had not lessened the possibility that the college could find a suitable property. In *San Jose Christian*, we considered it centrally important that there was no evidence to suggest that the religious institution desired by San Jose Christian College could not be obtained merely by "submitt[ing] a *complete* application." *San Jose Christian*, 360 F.3d at 1035; *see also id*. ("Should College comply with this request, it is not at all apparent that its re-zoning application will be denied."). Moreover, we

---

[20]In denying Guru Nanak's second application, the Board of Supervisors assured Guru Nanak that it would support a future application "if it was in the right location . . . closer towards Yuba City . . . further to the north of this site along with several other churches." The Board of Supervisors also advised that it would informally cooperate with Guru Nanak to locate a suitable site. Admittedly, the availability of other suitable property weighs against a finding of a substantial burden. *See San Jose Christian*, 360 F.3d at 1035. However, RLUIPA does not contemplate that local governments can use broad and discretionary land use rationales as leverage to select the precise parcel of land where a religious group can worship. *See Saint Constantine*, 396 F.3d at 900 (noting that RLUIPA's substantial burden test aims to protect religious groups from "subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards"). Moreover, given that Guru Nanak had repeatedly followed the guidance of governmental bodies about how to obtain a land entitlement to no avail, we cannot credit the Board's offer to cooperate as assuring Guru Nanak's future success.

noted that even if its complete application were denied, the college had no reason to believe another application would be rejected. *Id*. ("[There is] no evidence in the record demonstrating that College was precluded from using other sites within the city."). *See also Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) ("Because the Park Service's ban on sales on the Mall is at most a restriction on one of a *multitude of means*, it is not a substantial burden on their vocation.") (emphasis added).

### 3.  Compelling Interests

**[8]** The County effectively concedes that it has no compelling interest, much less that the restrictions are narrowly tailored to accomplish such interest. The County presents no such argument in its briefs. Because the County "shall bear the burden of persuasion," 42 U.S.C. § 2000cc-2(b), to prove narrowly tailored, compelling interests, we hold that the district court properly invalidated the County's denial of Guru Nanak's CUP application.

### B.  *Constitutionality of RLUIPA's Individual Land Use Assessments Provision*

**[9]** We now turn to the issue of whether RLUIPA as applied to the facts of this case is constitutional. It is axiomatic that "[t]he powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten." *Marbury v. Madison*, 1 Cranch 137, 176 (1803). We must therefore find an affirmative grant of power provided to Congress to enact a law such as RLUIPA. Because RLUIPA applies in this case due to the County's "individualized assessment" of Guru Nanak's application, the statute's constitutionality depends on Congress's power to "enforce, by appropriate legislation, the provisions of [the Fourteenth Amendment]." U.S. Const. amend. XIV, § 5. RLUIPA will be deemed constitutional only if there is "a congruence and proportionality between the injury to be prevented or remedies

and the means adopted to that end." *City of Boerne*, 521 U.S. at 520. We hold that RLUIPA is constitutional because it addresses documented, unconstitutional government actions in a proportional manner.

When evaluating whether a statute is a constitutional exercise of Congress's Enforcement Power pursuant to Section Five of the Fourteenth Amendment, "[t]he first step . . . is to identify with some precision the scope of the constitutional right at issue." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). "Preventive measures prohibiting certain types of laws may be appropriate [pursuant to Section Five] when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne*, 521 U.S. at 532. Accordingly, a congressional statute targeting local regulations subject to strict scrutiny—"presumptively invalid" regulations, *Smith*, 494 U.S. at 888—is more likely to be constitutional than a statute targeting regulations subject to more deferential review. *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003).

In this case, RLUIPA targets only "individualized governmental assessment[s]" subject to strict scrutiny under the Supreme Court's free exercise jurisprudence. Congress has power to enforce the Free Exercise Clause, as recognized in *Cantwell v. Connecticut*, 310 U.S. 296 (1940), because the "fundamental concept of liberty embodied in [the Fourteenth Amendment's Due Process Clause] embraces the liberties guaranteed by the First Amendment," *id.* at 303. The Supreme Court decided in *Smith* that whereas neutral laws of *general* applicability do not implicate free exercise-based constitutional concerns, laws "len[ding themselves] to *individualized* governmental assessment of the reasons for the relevant conduct," 494 U.S. at 884 (emphasis added), are subject to higher scrutiny because they may be unevenly applied against actions premised on religious exercise, *see id.* ("[A] distinctive feature of unemployment compensation programs is that

their eligibility criteria invite consideration of the particular circumstances behind an applicant's unemployment."). When such regulations involving individualized assessments impose substantial burdens on religious exercise, they are subject to strict scrutiny to protect and vindicate the right to free exercise of religion from governmental encroachment. *See id.*

As we decided earlier, here the County assessed the particular details behind Guru Nanak's application and weighed these particular facts against broad criteria. Therefore, because RLUIPA attempts to protect the free exercise of religion by targeting only regulations subject to strict scrutiny, "it [is] easier for Congress to show a pattern of state constitutional violations" sufficient to justify RLUIPA's enactment. *Hibbs*, 538 U.S. at 736.

After we identify the precise right—here, the free exercise of religion in the face of individualized governmental assessments subject to strict scrutiny—being protected by congressional legislation, "we examine whether Congress identified a history and pattern of unconstitutional [regulation] by the States against [religious groups]." *See Garrett*, 531 U.S. at 368. In nine hearings preceding the enactment of RLUIPA, Congress compiled a substantial amount of statistical and anecdotal data demonstrating that governmental entities nationwide purposefully exclude unwanted religious groups by denying them use permits through discretionary and subjective standards and processes. *See* H.R. Rep. No. 106-219, 18-24 (summarizing the evidence from these hearings). For instance, "[r]eligious groups accounting for only 9% of the population account for 50% of the reported litigation involving location of churches, and 34% of the reported litigation involving accessory uses at existing churches." *Id.* at 20-21. Congress also heard persuasive anecdotal evidence regarding a trend of denying newcomer religious groups CUPs in buildings that formerly housed non-religious assemblies or which had housed widely accepted religious groups. *Id.* at 21-22.

**[10]** The nature of the regulatory action RLUIPA targets and the evidence which demonstrated that such regulations often violated the Free Exercise Clause may empower Congress to stem such violations pursuant to its Section Five authority. *See City of Boerne*, 521 U.S. at 530 ("Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."). With that backdrop, we must determine if there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *See id.* at 520. We find it central to our decision that "[u]nlike [RFRA] at issue in *City of Boerne* . . . which applied broadly," *Hibbs*, 538 U.S. at 738, RLUIPA applies more narrowly.

**[11]** Unlike RFRA, the predecessor to RLUIPA, RLUIPA applies solely to regulations affecting land use and prison conditions, and therefore does not "displac[e] laws and prohibit[ ] official actions of almost every description and regardless of subject matter . . . . [nor does it] appl[y] to all federal and state law." *See City of Boerne*, 521 U.S. at 532. RLUIPA has nowhere near the "universal coverage," *id.* at 516, the Supreme Court found unacceptable in *City of Boerne. See also Cutter*, 125 S. Ct. at 2118 (stating that RLUIPA is "[l]ess sweeping than RFRA"). As with the statutes the Supreme Court has found to be valid as constitutional exercises of Congress's Section Five authority, RLUIPA solely includes "remedies aimed at areas where . . . discrimination has been most flagrant." *See South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966).[21] RLUIPA is a congruent and proportional

---

[21]We do note two potential concerns regarding the scope of RLUIPA.

First, *City of Boerne* noted a concern with the strict scrutiny test created by RFRA. 521 U.S. at 533-34 ("The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. . . . Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). While RLUIPA may use the same strict

response to free exercise violations because it targets only regulations that are susceptible, and have been shown, to violate individuals' religious exercise. Therefore, Congress constitutionally enacted RLUIPA pursuant to its enforcement power within Section Five of the Fourteenth Amendment.

## III.   CEQA Analysis and Injunctive Relief

This court reviews for abuse of discretion a district court's decision to grant an injunction. *Krug v. Lutz*, 329 F.3d 692, 695 (9th Cir. 2003).

[12] The County claims that the district court's injunction violated the California Environmental Quality Act (CEQA), Cal. Pub. Res. Code § 21000, *et seq.*, when it ordered the County immediately to approve Guru Nanak's CUP application. The district court did not abuse its discretion, however, because the County has already fully reviewed the environmental impact of the application without stating any deficiency. If residents had not appealed the Planning Commission's decision, the Commission's review of the Planning Division's detailed environmental impact report on Guru Nanak's application would have been final. In fact, the Planning Division attached thirty-three detailed conditions to its approval of Guru Nanak's application—all dealing with the

---

scrutiny standard as did RFRA, it applies the standard only to types of regulations subject to strict scrutiny in the past. *See supra* Part II.B.

Second, RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This definition of "religious exercise" is broader than the definition in RFRA. *See Civil Liberties*, 342 F.3d at 760. However, RLUIPA's expanded meaning of "religious exercise" applies, as is relevant here, only to individualized assessments pursuant to land use regulations. As noted above, Congress sufficiently documented how local governments stifle religious groups' religious exercise by denying such groups the ability to use property for religious purposes.

environmental impact of the proposed temple. Neither a Commission member nor a Board member ever disagreed with the Planning Division's conclusion that Guru Nanak's application, subject to several mitigation measures, complied with CEQA.

The County specifically points to Guru Nanak's future plans of expanding its congregation facilities and membership as a reason why it must further review Guru Nanak's application for environmental impact. The California Supreme Court in *Laurel Heights Improvement Ass'n v. Regents of University of California*, 47 Cal. 3d 376, 396 (1988), held that an environmental impact report (EIR) "must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects."[22] The County points to Guru Nanak's statement in its application that this first temple is an interim use and that the group intends to build a larger temple and parking lot in the future—both "reasonably foreseeable consequences of the initial project."

Although Guru Nanak, like many religious congregations, may have tentative plans to expand in the future, the construction of new installations is not a foreseeable result of Guru Nanak's application. Any later expansion would have to go through a new application process with a new EIR. *Lucas Valley Homeowners Ass'n. v. County of Marin*, 233 Cal. App. 3d 130 (1991), is analogous to the situation here. In *Lucas Valley*, the court stated that the County of Marin did not need

---

[22]In *Laurel Heights*, the UC Regents approved a use permit for a building that was going to be vacant in the near future. 37 Cal. 3d at 396-97. The Regents undoubtedly were going to fill the already standing, vacant building with additional occupants. *Id.* This situation is distinct from the one at issue here, because Guru Nanak would have to construct a new building if it wanted to expand its operations.

to consider an orthodox Jewish group's future hopes for expansion when expansion plans were not proposed for approval in the group's application and would be subject to a future application process. *Id.* at 161-62. Similarly, Guru Nanak here has agreed to a capacity of seventy-five people in the building it plans to convert into a temple, and future construction would require another application process.

## IV.  Conclusion

We AFFIRM the district court's order granting summary judgment for Guru Nanak and enjoining the County immediately to approve and grant Guru Nanak's CUP application.

AFFIRMED.