# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4144 & 05-4234

VISION CHURCH, UNITED METHODIST,

*Plaintiff-Appellant*,

and

NORTHERN ILLINOIS CONFERENCE OF UNITED
METHODIST CHURCH and C. JOSEPH SPRAGUE,
presiding Bishop (now by succession,
Bishop Hee-Shoo Jung),

*Intervenors-Appellants,*

*v.*

VILLAGE OF LONG GROVE,

*Defendant-Appellee.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 5761—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED MAY 2, 2006—DECIDED NOVEMBER 7, 2006

———————

Before CUDAHY, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 2003, Vision Church, United Methodist ("Vision") filed the present action against the Village of Long Grove, Illinois ("Village"); Vision alleged that the Village's denial of Vision's application for voluntary

annexation, its involuntary annexation of Vision's property, its enactment of a municipal Public Assembly Ordinance, and its denial of Vision's applications for a special use permit to build and occupy a church on real property it had purchased violated the First and Fourteenth Amendments to the Constitution of the United States, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), *see* 42 U.S.C. § 2000cc, and various Illinois laws. The district court granted summary judgment in favor of the Village on October 7, 2005. Vision now appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. Application for Annexation

Vision is a religious corporation of the State of Illinois currently located in Mundelein, Illinois; it was founded in 1981, joined the United Methodist denomination in 1988, and adopted the name "Vision Church, United Methodist" in August 2001. Its membership, which currently totals approximately 120 persons, consists primarily of Korean-Americans.

The Village of Long Grove is an 18-square mile community located in Lake County, Illinois, with a population of approximately 6,000. According to the Village's "Comprehensive Plan," it is dedicated to preserving its "rural character," to the "provision of a quiet countryside" and to the enjoyment of "open space." R.98, Ex.3 at 02-1, 03-1. The Zoning Regulations of the Village of Long Grove ("Zoning

Regulations") govern the building and location of public buildings, including religious institutions; under the Zoning Regulations, religious institutions are permitted as "special uses" in areas zoned as "R1," "R2" and "R3" Residential Districts, as are schools, fire stations and sewage treatment facilities.[1] *See* Zoning Regulations: The Village of Long Grove § 5-4-2-2, R.99, Ex.2 (hereinafter "Zoning Regulations") (setting forth the special uses allowed in a "R1" district); *id.* § 5-4-3-2 (same for "R2"); *id.* § 5-4-4-2 (same for "R3"); *see also id.* § 5-11-6(D) (setting forth the procedures governing the Village's consideration of an application for the "special use" of a property).

Prior to 1999, Vision was located in Park Ridge, Illinois. In 1999, however, it began looking for a new church site: It expected its membership to grow significantly in the upcoming years and desired a larger facility. It purchased a 27.40-acre vacant plot in unincorporated Lake County, Illinois, in September 2000, "with [the] intention to build a church there." R.1-1 at 3. "[M]any Korean-American immigrants in the Chicago-area and families in the congregation had moved to Lake County," making the site ideal

---

[1] The Village's Zoning Regulations divide land into the following zoning districts: Residential ("R1," "R2" and "R3"); Historic Business ("B1"); Suburban Business ("B2"); Office and Research ("O&R"); Office ("O"); and Open Space ("OS-N," "OS-P" and "OS-R"). *See* Zoning Regulations: The Village of Long Grove § 5-3-1, R.99, Ex.2 (hereinafter "Zoning Regulations"). Each of the zones provide for "special uses." *Id.* § 5-2-11. To obtain a special use permit, an applicant must be in a district where the use is permitted as a "special use" and must meet the standards for qualifying as a special use set forth in § 5-11-6(D) of the Zoning Regulations. *See id.* § 5-11-6(D).

for the construction of a new church facility. R.177-2, Ex.76 at 2.

At the time of purchase, Vision's property was zoned for church development under the Lake County Zoning Code; however, Vision desired to build the church within the incorporated municipality of the Village of Long Grove. Reverend Soon-Chang Jang, the head pastor of Vision Church, has explained that "Vision wanted to build a good relationship with the Long Grove residents," and believed that being within the Village would further this goal. *Id.* at 5. Therefore, on June 6, 2000, Vision applied to the Village of Long Grove for annexation under 65 ILCS 5/7-1-8. *See* 65 ILCS 5/7-1-8 ("Any territory which is not within the corporate limits of any municipality but which is contiguous to a municipality at the time of annexation . . . may be annexed to the municipality . . . [by] a written petition signed by the owners of record . . . . A majority vote of the corporate authorities then holding office is required to annex."). In its application, Vision requested as a condition of annexation that the Village zone its property "Residential (R2)" and grant Vision a "special use" permit to construct a church complex on the property. R.177-1, Ex.52 at 1. It proposed plans for a 99,000-square foot church facility, consisting of five main buildings and an over 1,000-seat sanctuary.

Soon after the submission of this application, Vision and the Village entered negotiations over the conditions of annexation. During these negotiations, the Village expressed concern about the size of the church complex and its compatibility with the Village's goal of protecting natural resources and maximizing open space. In December 2000, at the Village's request, Vision agreed to submit revised plans; in March 2001, its representatives presented these revisions

to the Plan Commission of the Village of Long Grove ("Plan Commission"). Under the new plans, the size of the church complex had been decreased to 56,200 square feet, consisting of three main buildings (a sanctuary, an administration building and a Sunday school building); the sanctuary would seat 600 instead of 1,000; and parking spaces were reduced from 400 to 240.

In addition, Vision agreed to comply with some, but not all, of the Village's conditions on construction. For example, it agreed to remove the "Fountain, Chapel in the Woods and Outdoor Amphitheater" from the plan, to mark "[a]ll wetland and conservancy soils . . . as lowland conservancy easements," and to serve the religious facilities "by on-site waste disposal systems and/or septic systems." R.98, Ex.14 at 2 (describing the conditions); *see also id.*, Ex.15 at 1 (accepting the conditions). However, in a letter dated August 6, 2001, Vision refused to consent to the following limitations: (1) that "easement language . . . be placed on site plan indicating no future structures or impervious parking allowed"; (2) that "[t]he area marked 'playing field' on the east side of the plan . . . be marked 'Natural Landscaped Area' . . . and no organized outside activities . . . be allowed in the area"; and (3) that "[o]nly two services Sunday or holidays excepting weddings and funerals [be held]. And no more than one major activity each week Monday through Friday, excepting weddings and funerals." *Id.*, Ex.14 at 2; *see also id.*, Ex.15 at 1 (rejecting the conditions). Specifically, Vision claimed that the second condition was inconsistent with its intention "to have a playground for children"; it claimed that the third limitation "necessarily entangle[d] the Village in the operations of the Church." *Id.*, Ex.15 at 1.

On August 7, 2001, the Plan Commission voted to recom-

mend the denial of Vision's application for annexation.[2] On August 14, this recommendation was accepted by the Long Grove Board of Trustees ("Board").[3]

### 2. Involuntary Annexation and the Public Assembly Ordinance

In May 2001, while Vision's application for annexation still was pending with the Plan Commission, a local developer, Joseph Valenti, also applied for voluntary annexation of his land. Valenti owns 120 acres of land adjacent to Vision's property; like Vision, Valenti wanted his land to be within the Village's corporate boundaries. He further requested that, upon annexation, the Village rezone his land "Residential." The Plan Commission recommended approval of Valenti's application on September 4, 2001.[4] The Board accepted this recommendation on October 9, 2001.

---

[2] *See also* Plan Commission Agenda, R.100, Ex.21 at 2 (summarizing the Plan Commission's objections to the revised plans, including "the size of the parking lot; the buildings having been reduced by only a few thousand square feet; the future growth . . . ; and the setting of precedent for future development on large parcels within the Village").

[3] No action was taken at this time with regard to Vision's application to rezone its land as a Residential District or for a special use permit. In the absence of annexation, the Village did not possess jurisdiction over Vision's property and, therefore, had no authority to address these matters.

[4] Vision alleges that the Village "accelerated public hearings and development approvals" for Valenti's annexation application, in order to facilitate the subsequent involuntary annexation of Vision's property. *See* R.1-1 at 5 (noting that, typically, approval of an application for annexation takes far longer than 90 days).

As a result of the annexation of Valenti's property, Vision's land was surrounded on all sides by property within the Village's corporate boundaries. Under 65 ILCS 5/7-1-13, the Village therefore had the authority to involuntarily annex Vision's property without regard to the conditions of annexation previously set by Vision. *See* 65 ILCS 5/7-1-13 ("Whenever any unincorporated territory containing 60 acres or less, is wholly bounded by [] one or more municipalities . . . that territory may be annexed by any municipality by which it is bounded in whole or in part, by the passage of an ordinance to that effect after notice is given as provided in this Section."). On October 23, 2001, the Village passed an ordinance annexing Vision's property. *See* An Ordinance Annexing the Surrounded Property at the Southwest Corner of Gilmer and North Krueger Roads, R.1-1, Ex.D at 1-2 (noting that because "the unincorporated territory [owned by Vision] is contiguous to and totally surrounded by the Village of Long Grove," with proper notice, it may be annexed under 65 ILCS 5/7-1-13). The Village zoned the property "R2" Residential, the zoning classification sought by Vision in its June 2000 application for annexation.[5]

---

[5] The involuntary annexation of Vision's property terminated its application for approval of building plans with Lake County. When purchased by Vision, the property in question was located in Lake County. Vision thereafter applied for voluntary annexation to the Village; as an alternative to annexation, it also applied at this time for permission from Lake County to build a church complex on the property. Because Lake County Zoning Code requires neither a special permit nor rezoning of the property, at the time of the involuntary annexation Vision merely was awaiting approval of building plans by the Lake County

(continued...)

In November 2001, the Manager of the Village of Long Grove, Cal Doughty, introduced an amendment to the Village's Zoning Regulations, entitled, "An Ordinance Amending the Village Code Regarding Public Assemblies" (the "Assembly Ordinance"). The Ordinance restricts the size and capacity of buildings used for "public assembly," such as "religious institutions, aquariums, libraries, museums, private schools, and other similar uses," R.1-1, Ex.F at 1.[6] Specifically, it provides that a complex comprised of three buildings located on fifteen or more acres, but not fronting a state highway, cannot exceed a total square footage of 55,000.[7] It also imposes restrictions on parking, setbacks from the road and the flow of traffic. According to the Village Planning and Development Committee, the Ordinance is designed to preserve the status of the Village

(...continued)

Board. However, after the property was involuntarily annexed by the Village of Long Grove, Lake County no longer had jurisdiction to consider Vision's plans or to approve the building of the church complex.

[6] Although the Village Zoning Regulations detailed the standards governing the approval of a special use application, prior to the passage of the Assembly Ordinance, the Regulations did not specify maximum capacity or size or minimum lot size for buildings constructed on properties within the Village's jurisdiction.

[7] The permissible square footage is 100,000 if the complex is located on twenty or more acres and fronts a state highway; the permissible square footage decreases if the complex contains one or two, instead of three, buildings. *See* R.1-1, Ex.F at 1 (also imposing various regulations on parking and maximum lot coverage).

as a "low density, residential community," as desired by its residents, and to thwart the development of buildings that "defeat the very purpose of the scenic corridor." R.100, Ex.47 at 1-2. The Board enacted the Assembly Ordinance on April 9, 2002; it was incorporated as section 5-11-6.1 of the Zoning Regulations.

### 3. Vision's 2002 Application for a Special Use Permit

After its involuntary annexation, Vision's property was zoned by the Village "R2" Residential, which permits the construction of a religious facility with a special use permit. On January 23, 2002, approximately four months prior to the passage of the Assembly Ordinance, Vision applied for such a permit. However, instead of the 56,200-square foot complex discussed in March 2001 during negotiations over voluntary annexation, Vision requested approval in its special use application for a 99,000-square foot, 5-building, 1,000-seat sanctuary facility,[8] similar to the facility originally proposed in 2000.[9]

A public hearing was held on Vision's application in May 2002, after the passage of the Assembly Ordinance. The Plan Commission ultimately recommended the denial of Vision's request for a permit, given that the 99,000-square foot complex far exceeded the permissible square footage for a facility on property of this size and nature under the Assembly Ordinance. The Board accepted this recommen-

---

[8]  *See also* Board Meeting Minutes, R.99, Ex.14 at 4 (describing the terms of the 2002 application); *see also* R.177-1, Ex.72 (comparing the 2001 and 2002 plans).

[9]  In June 2002, Vision presented amended plans for an 80,000-square foot facility, but nevertheless asked the Plan Commission to vote on the 99,000-square foot proposal.

dation on July 9, 2002.[10]

Because its building plans have not yet been approved by the Board, Vision temporarily has relocated to shared space in Mundelein United Methodist Church in Mundelein, Illinois.

### B. District Court Proceedings

On August 18, 2003, Vision filed the present action in the United States District Court for the Northern District of Illinois; an amended complaint was filed in December 2004. Counts I, II and XI of the amended complaint challenge (1) the Village's denial of Vision's September 2000 application for annexation; (2) the Village's involuntary annexation of Vision's property in October 2001; (3) the Village's passage of the Assembly Ordinance in April 2002, limiting the size and capacity of buildings used for public assembly; and (4) the Village's denial of Vision's application for a special use permit in both 2000 and 2002. Vision alleged that these actions "constitute[d] an infringement of Vision's First Amendment right to the free exercise of religion," R.62 at 11 (Count I); violated RLUIPA's free exercise provision, which prohibits land use regulations that impose a substantial burden on religious exercise, *see id.* at 12 (Count II); and resulted in a "substantial[] burden[] [on] Vision's exercise of religion," in violation of the Illinois Religious Freedom Restoration Act of 1998, *id.* at 24 (Count XI). Counts III and IV allege a violation of the First Amendment Free Speech and Establishment Clauses. Counts V and

---

[10] *See* Board Meeting Minutes, R.99, Ex.14 at 4 (describing the project as a "high-density proposal in a low-density community").

VI allege that the Village violated the Fourteenth Amendment Equal Protection Clause and RLUIPA's "[e]qual terms" provision by

> a. Allowing restaurants, tearooms, taverns and health clubs as permitted uses in certain zones, but providing no zone in which churches are permitted uses; and

> b. Imposing more restrictive requirements upon Vision than those imposed upon the six churches operating in Long Grove.

> c. Imposing more restrictive requirements upon Vision than those imposed upon the schools directly to the north of the subject property.

*Id.* at 15 (Count V); *id.* at 16 (Count VI).

Counts VII and VIII allege that, because the Village's Zoning Regulations "provide[] no zone in which Vision or another newly arrived or newly formed church may locate except by permission of the Village Board," they violate the First Amendment and RLUIPA's prohibition on the unreasonable exclusion of religious activity. *Id.* at 17 (Count VII); *id.* at 18 (Count VIII). Count IX alleges that the Village's denial of Vision's applications for a special use permit was arbitrary and capricious. *See id.* at 19-20 (claiming that the Village's denial of the 2001 permit application was unjustified, and that the denial of the 2002 permit application was unsupported by "any findings"). Finally, Count X alleges that Vision had a "vested right to build a church on [its] property" because it purchased the land on the "good faith" belief that building and operating a church was a permitted use of the land under the Lake County Zoning Code; according to Vision, by "[i]nvoluntarily annexing Vision's property with the result that Vision would not receive a building permit from Lake County,"

and by "[p]assing the [Assembly Ordinance] with the result that Vision's proposed use could not be allowed under the Long Grove zoning ordinance," the Village impermissibly interfered with Vision's vested right. *Id.* at 21.

Vision requested that the district court issue a declaratory judgment that "it may use its property in Long Grove as a permitted use under Lake County or Long Grove zoning code, whichever is least restrictive"; enjoin the Village from further interfering with use of its property; and award compensatory and punitive damages in the amount of $5,000,000. *Id.* at 12. It also sought the award of attorneys' fees and costs.

In October 2003, the Northern Illinois Conference of the United Methodist Church (the "Conference") and its Presiding Bishop, C. Joseph Sprague, moved to intervene as of right, *see* Fed. R. Civ. P. 24(a), or permissively, *see id.* 24(b)(2), for the purpose of "support[ing] . . . the causes of action" of its member congregation, Vision Church. *See* R.10 at 1. As the Conference explained, Vision's property in the Village

> is held subject to a trust clause in favor of the Confer-ence and the larger denomination and is also subject to reversionary rights in favor of the Conference. Thus, any impairment of Vision Church's constitutional and statutory rights to build, occupy and worship on its land in Long Grove is, by necessity, an affront to the Conference's distinct legal interests as well.

*Id.* at 1-2. On April 5, 2004, the district court granted the Conference's motion to intervene as of right under Rule 24(a).

On March 9, 2005, the Village filed a motion for summary judgment on all counts; on this same day, Vision filed

a cross-motion for summary judgment on Counts I, II, IV, V, VI, VIII, IX and X. On October 18, 2005, the district court granted summary judgment in favor of the Village on all counts.

First, the district court held that Vision had not demonstrated a violation of the Establishment Clause. It classified Vision's challenge as directed exclusively at the Assembly Ordinance and held that the ordinance is "secular in purpose because it merely controls development, and not Vision's religious activities." R.157 at 12. It also found that the primary effect of the Assembly Ordinance is not to inhibit or advance religion; the court rejected the significance of the "temporal proximity between Vision's involuntary annexation and the passage of the Public Assembly Ordinance" and instead found dispositive the fact that the ordinance applies to *all* public use facilities, religious and non-religious alike, as well as that the Village did not "affiliate[] itself with one religion, . . . thereby taking sides against Vision." *Id.* at 13. For these same reasons, the court found no excessive entanglement with religion.

Second, the court concluded that the Assembly Ordinance does not violate the Free Exercise Clause. "[R]estriction[s] on the physical size of the proposed buildings" do not necessarily "restrict[] [] Vision's beliefs or customs." *Id.* at 15. The size restrictions in this case are traceable to neutral land planning goals; in addition, 55,000 square feet is "ample space to house a congregation of 140 adults and 80 children comfortably." *Id.*

The district court determined that Vision's RLUIPA claims fared no better. Section 2(a)(1) of RLUIPA prohibits the imposition of a "substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). Applying this test, the district court

held that Vision "did not incur a 'substantial burden' for purposes of the RLUIPA." R.157 at 18. Because it could have built a 55,000-square foot facility on the property, in compliance with the Assembly Ordinance, "it was Vision, not the Village," that ultimately is responsible for the church not being approved by the Plan Commission and the Board. *Id.* The court also found that the "over fifty conditions" imposed on the "proposed development of the church complex" did not constitute a substantial burden on religious exercise because these conditions did not "render[] *any* religious exercise on the property effectively impracticable." *Id.* at 18-19 (emphasis added). Moreover, the conditions did not impact the Village's ultimate decision not to approve construction: Had Vision submitted a plan that complied with the ordinance's size restrictions, "there might be a church complex today." *Id.*

The district court similarly rejected Vision's claims with respect to RLUIPA § 2(b)(1), which prohibits the "impos[ition] or implement[ation] [of] a land use regulation in a manner that treats a religious . . . institution on less than equal terms with a nonreligious . . . institution." 42 U.S.C. § 2000cc(b)(1). According to the district court, Vision has not "identified a non-religious group that has received more favorable treatment," given that "the Village . . . does not apply the [Assembly] Ordinance only to religious institutions, but evenly to all petitioners that come before the Plan Commission," including schools and existing churches within the Village. R.157 at 20.[11]

_____

[11] The district court recognized that the schools across the street from Vision's property are larger than 55,000 square feet; however, because they were "built in 1999, before the Public

(continued...)

The district court next turned to Vision's Fourteenth Amendment equal protection claim. It held that the Assembly Ordinance is subject only to rational basis scrutiny because it is "facially neutral and generally applicable," *id.* at 24; it does not classify on the basis of race, gender, national origin or religion, but rather only distinguishes between public assembly and private locations. Further, the size limitations imposed by the Assembly Ordinance are rationally related to a legitimate government end—that of carrying out the Village's "stated planning goals . . . for a quiet countryside, with an unhurried environment where families can enjoy the open space." *Id.* at 24.

Moreover, the court found that Vision had not demonstrated that "it is a class of one," who was "treated differently than others similarly situated" without a "rational basis for the difference in treatment." *Id.* at 22-23 (internal quotation marks omitted). Vision had claimed that, to build a restaurant or tavern, an owner need not obtain a special use permit, but a permit is required to build a church. However, according to the court, "these uses [are] only allowed in the Village's business district, as opposed to the Residential district where Vision wishes to build," demonstrating that Vision is not "similarly situat[ed]" to these institutions. *Id.* at 23. In sum, "Vision was treated the same under the Ordinance as any other developer" who sought to build a public assembly facility exceeding 55,000 square feet on a tract of land similar in size and location to Vision's property. *Id.* at 24.

---

[11] (...continued)
Assembly Ordinance was enacted," they were not subject to the same size restrictions as Vision. R.157 at 20.

The court also granted summary judgment to the Village on Vision's state law vested rights claim. Vision contended that it had purchased the 27 acres in reliance on the Lake County Zoning Ordinance, under which, at the time of purchase, "a church was a permitted use, as of right." *Id.* at 27 (internal quotation marks omitted). The district court rejected this claim. Vision's vested rights claim, it held, is grounded in the Lake County Zoning Ordinance and therefore both the complaint and the remedy sought is directed at the County; "[h]owever, Vision names only the Village in its suit." *Id.* Further, the court held that Vision could not "establish that there was a probability of municipal approval to build a church complex on its property," given that neither the Village nor Lake County had offered any assurances regarding the issue. *Id.*

Additionally, the district court rejected Vision's claim that the Village's denial of its application for a special use permit in 2002 was "arbitrary and capricious." *Id.* Not only is there "no evidence that raises more than a scintilla of evidence to show a genuine triable issue of material fact on this matter," but the Village cannot be sued for monetary relief under the Illinois Tort Immunity Act, *see* 745 Ill. Comp. Stat. 10/2-104.

Lastly, in a footnote, the district court granted summary judgment to the Village on Vision's "exclusion" claims. "There is no 'exclusion' clause in the First Amendment," the court concluded, "and therefore the court grants summary judgment on this Count." R.157 at 11 n.2.

Vision timely appealed.

## II

## DISCUSSION

We review the district court's grant of summary judgment de novo. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1012 (7th Cir. 2006). In doing so, we must construe all facts and reasonable inferences in the light most favorable to the non-movant. *See id.* Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

### A. Vision's "Exclusion" Claims

Vision first contends that the district court erred in holding that "[t]here is no 'exclusion' clause in the First Amendment" and that summary judgment was proper on Count VII. R.157 at 11 n.2. According to Vision, the Supreme Court previously has recognized that, when activity protected by the First Amendment is "excluded" by municipal ordinance, the municipality must "advance[] sufficient justification" for its actions—a requirement that, in turn, was codified in RLUIPA § 2(b)(3). Appellant's Br. at 19 (discussing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981)).

In *Schad*, 452 U.S. 61, the Supreme Court addressed the claims of an adult bookstore in Camden County, New Jersey, against the Borough of Mount Ephraim. Inside the bookstore were "coin-operated devices by virtue of which a customer could sit in a booth, insert a coin, and watch an adult film," *id.* at 62; the Borough found that

this activity violated § 99-15B of its zoning ordinance, under which "nude dancing[] is not a permitted use in any establishment in [its jurisdiction]," *id.* at 65 (internal quotation marks omitted). The bookstore challenged the "imposition of criminal penalties under [the zoning] ordinance," claiming that the prohibition on live entertainment "violated [its] rights of free expression guaranteed by the First and Fourteenth Amendments of the United States Constitution." *Id.* The Supreme Court agreed and held that the ordinance as applied to the bookstore was constitutionally infirm:

> Whatever First Amendment protection should be extended to nude dancing, live or on film, . . . the Mount Ephraim ordinance prohibits all live entertainment in the Borough: no property in the Borough may be principally used for the commercial production of plays, concerts, musicals, dance, or any other form of live entertainment. . . . [A]s is true of other ordinances, when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest. . . . The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.

*Id.* at 66, 68, 70 (internal quotation marks omitted). The Supreme Court concluded that the Borough had not justified adequately its substantial restrictions on live entertainment; there was no evidence, the Court found, to support the Borough's claim that live entertainment brings with it a host of problems, such as parking and trash. *Id.* at 74 ("[T]his ordinance is not narrowly drawn to respond to what might be the distinctive problems arising from certain types of live entertainment, and it is not clear that a more selective

approach would fail to address those unique problems if any there are."). In sum, *Schad* stands for the proposition that an "ordinance [that] completely prohibit[s] the expressive conduct at issue," *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 716 n.21 (7th Cir. 2003), must be supported by "sufficient justification," *Schad*, 452 U.S. at 67, and be narrowly tailored to that justification, *see id.* at 68.

A similar First Amendment protection, albeit limited to religious freedoms, is embodied in RLUIPA § 2(b)(3). Section 2(b)(3) prohibits a "government" from

impos[ing] or implement[ing] a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(b)(3).[12]

---

[12] RLUIPA was enacted in the wake of the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507 (1997), which invalidated the Religious Freedom Restoration Act of 1993 ("RFRA"), insofar as that Act regulated state as well as federal action, on the ground that it exceeded Congress' power under the enforcement clause of the Fourteenth Amendment.

It should be noted that the Village does not challenge the constitutionality of RLUIPA. *See also Freedom Baptist Church of Delaware County v. Township of Middletown*, 204 F. Supp. 2d 857 (E.D. Pa. 2002) (upholding RLUIPA against the claim that Congress exceeded its authority under the Commerce Clause when it adopted the legislation; also holding that RLUIPA's substantial burden, equal terms and exclusion provisions do

(continued...)

According to Vision, because "[n]owhere in Long Grove is a church a permitted use" but instead churches are "allowed only as [] special use[s]," and because the right to religious exercise therefore is "exercisable only at the discretion of local governmental officials," the municipality has excluded the development of religious institutions within its jurisdiction, in violation of the First Amendment protections recognized by *Schad* and of RLUIPA § 2(b)(3)(A). Appellant's Br. at 19. We cannot agree. *Schad* applies only to the complete and total exclusion of activity or expression protected by the First Amendment. *See Schad*, 452 U.S. at 76 ("Here, the Borough *totally* excludes all live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment." (emphasis added)); *id.* (distinguishing *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), on the ground that the Court in *Young* "did not purport to approve the *total exclusion* from the city of theaters showing adult, but not obscene, materials" (emphasis added)); *id.* at 66 ("[T]he Mount Ephraim ordinance prohibits *all live entertainment* in the Borough: *no property* in the Borough may be principally used for the commercial production of plays, concerts, musicals, dance, or any other form of live entertainment" (emphasis added)); *see also Ben's Bar, Inc.*, 316 F.3d at 716 n.21 (classifying *Schad* as addressing an "ordinance [that] *completely prohibit[ed]* the expressive conduct at issue" (emphasis added)). The same is true of

---

[12] (...continued)
not violate the Free Exercise Clause of the First Amendment but instead codify First Amendment jurisprudence); *Mayweathers v. Terhune*, 2001 WL 804140 (E.D. Cal. 2001) (upholding RLUIPA's constitutionality). *Cf. Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) (in the context of a prisoner's rights case, upholding the constitutionality of 42 U.S.C. § 2000cc-1(a)).

section 2(b)(3)(A) of RLUIPA. *See* 42 U.S.C. § 2000cc(b)(3)(A) (prohibiting the "*total[] exclu[sion]* [of] religious assemblies" (emphasis added)).

In the present case, the Village, by permitting churches in all residential districts as a special use, has not completely or totally excluded religious assemblies from its jurisdiction. Six churches currently operate within the Village. Moreover, Vision is permitted to build a church on the land as it is currently zoned, provided that it applies for a special use permit, complies with the procedures set forth in § 5-11-6(B) and (C) of the Village Zoning Regulations, and fulfills the standards governing the Board's consideration of a special use application set forth in § 5-11-6(D). Specifically, under § 5-11-6(D), the Board may grant a special use permit if the special use:

> 1. Is deemed necessary for the public convenience at that location;
>
> 2. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;
>
> 3. Will not cause substantial injury to the value of other property in the neighborhood in which it is located; and
>
> 4. Except as may be recommended by the Plan Commission and approved by the Village Board and conforms, except in the case of a planned development, to the applicable regulations of the district in which it is to be located.

Zoning Regulations § 5-11-6(D), R.99, Ex.2. In addition, § 5-11-6.1, which codified the Assembly Ordinance, mandates that Vision's plans comply with certain size and capacity restrictions.

This case therefore is distinguishable from *Schad,* where the zoning code excluded all live entertainment as a permissible use in the Borough's business district and did not set forth a method by which to obtain a special use permit for this activity. *See Schad,* 452 U.S. at 64-66. Here, by contrast, if the conditions set forth in the Village's zoning code are fulfilled, a church may be built on property zoned for residential use. *Cf. R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 409 (7th Cir. 2004) (holding that an ordinance permitting nude dancing only as a special use did not "amount[] to a total ban on protected activity," because it placed restrictions only on the *location* of such businesses). Thus, we conclude that the Village Zoning Regulations do not violate the First Amendment protections recognized in *Schad* or RLUIPA § 2(b)(3)(A).

This does not end our inquiry, however. Section 2(b)(3) of RLUIPA also prohibits a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B). As the legislative history evidences, "[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations." 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady). In this case, we cannot conclude that requiring Vision to obtain a special use permit to build and operate its church in a residential district "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B). Vision's primary argument on appeal is that the Board's discretion in granting a special use permit is unbridled and therefore its consideration of Vision's application was unreasonable. We disagree. This is not a case where the "state [has] delegate[d] essentially standardless discretion to nonprofessionals operating

without procedural safeguards." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). The Board's discretion is narrowly circumscribed by the Village's Zoning Regulations, which set forth the various factors to be considered by the Board in addressing an application for a special use permit. *See* Zoning Regulations § 5-11-6(D), R.99, Ex.2; *id.* § 5-11-6.1.

Even if the Zoning Regulations were to grant the Board undue discretion, this does not demonstrate the violation of RLUIPA § 2(b)(3)(B). The requirement that churches obtain a special use permit is neutral on its face and is justified by legitimate, non-discriminatory municipal planning goals. As a general matter, special use designations are instruments of municipal planning that allow city officials to retain review power over land uses that, although presumptively allowed, may pose special problems. In this case in particular, the special use designation is substantially related to the municipal planning goals of limiting development, traffic and noise, and preserving open space; these goals, in turn, are reflected in the Village's Comprehensive Plan, "which seeks to ensure that the semi-rural atmosphere of the community is maintained while simultaneously permitting a wide variety of quality development in character with the existing motif of the community." Comprehensive Plan, R.99, Ex.3 at 01-1. To carry out this goal, the Village also has required many secular institutions, including "[s]chools, elementary and high, including playgrounds and athletic fields," "[u]tility and public service uses," and "[n]ursing homes," to be approved as a special use in a residential district. Zoning Regulations § 5-4-2-2, R.99, Ex.2. Like these institutions, religious assemblies have a reasonable opportunity to build within the Village, provided that the requirements for a special use permit have been fulfilled.

**B. Establishment Clause**

Vision next contends that the district court erred in granting summary judgment to the Village on Count IV, its claim that the Assembly Ordinance and the "special-use standards" violate the First Amendment's Establishment Clause. Appellant's Br. at 44. The district court held that the Assembly Ordinance is secular in both purpose and effect and did not risk excessive entanglement with religion. Vision now responds that the Village's other land use regulations, and their application to Vision, violate the Establishment Clause because they "benefit[] existing religious institutions over new ones." *Id.*

The First Amendment to the Constitution of the United States provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I, cl. 1.[13] In evaluating an Establishment Clause claim, "[t]he touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. ACLU,* 125 S. Ct. 2722, 2733 (2005) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968)). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary,* 125 S. Ct. at 2733. Specifically, a government policy or practice violates the Establish-

---

[13] This provision is made applicable to the states and its political subdivisions, including municipalities, through the Fourteenth Amendment.

ment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971); *see also McCreary,* 125 S. Ct. at 2733 (reaffirming *Lemon*'s "three familiar considerations for evaluating Establishment Clause claims"). "The Establishment Clause also prohibits the government from favoring one religion over another without a legitimate secular reason." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005); *see also Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160, 1168-69 (7th Cir. 1993) ("Under the Establishment Clause, the government may not aid one religion, aid all religions or favor one religion over another.").

Vision's primary argument is that, by imposing restrictions on the construction of new churches, including the size and capacity regulations set forth in the Assembly Ordinance and the findings required by § 5-11-6(D) of the Zoning Regulations, the Village discriminates against the "practices of new religious assemblies." Appellant's Br. at 44. According to Vision, these restrictions "make it easier for the adherents of one or more sects to practice their religions [while not] extend[ing] these benefits, however slight, to the adherents of other sects." R.89 at 3.

We agree with the district court that Vision has not demonstrated that the Village's land use regulations have no secular purpose, that their primary effect advances or inhibits religion or that they foster excessive entanglement with religion. We first address whether the applicable provisions—the Assembly Ordinance and the special use standards—have a secular purpose. "In determining whether a particular government action affecting a religious symbol has a secular purpose, a government's characterization of its purpose is entitled to deference," although courts

"must ensure that the government's characterization is sincere." *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 704 (7th Cir. 2005). In the present case, the Village contends that the land use regulations are justified by the goals of the Village's Comprehensive Plan—that of minimizing development and maximizing open space. Although we express some concern about the general course of events in this case,[14] we ultimately find this secular purpose to be "sincere." *Id.* The Comprehensive Plan discusses repeatedly the "semi-rural" nature of the Village, the community's emphasis on "open space," and the importance of conforming development to these goals. R.99, Ex.3 at 01-1. As the Plan itself states:

> Since its incorporation in 1956, the residents of Long Grove have diligently worked to develop and vigorously supported a comprehensive plan which seeks to ensure that the semi-rural atmosphere of the community is maintained while simultaneously permitting a wide variety of quality development in character with the existing motif of the community. . . . Preserving Long Grove's semi-rural charm, while still permitting quality development, is the most important goal of this Comprehensive Plan.

*Id.* Further, in describing the Village's "Community Character," the Comprehensive Plan explains:

> Long Grove's unique community character sets it apart from adjoining communities. The most critical of the Village's goals are the provision of a quiet country-

---

[14] This case presents no claim that the Village has discriminated against Vision on the basis of race or ethnicity and, of course, we express no view on this issue.

side, with an unhurried and unstructured environ-
ment where families can live and enjoy the open
space, and the preservation of community character
through Long Grove's consistent and longstanding
efforts to maintain the qualities of such lifestyles.

*Id.* at 03-1.

The land use regulations challenged by Vision are tailored
to this secular purpose. The Assembly Ordinance applies to
all buildings used for "public assembly," including not only
"religious institutions," but also "aquariums, libraries,
museums, private schools, and other similar uses." R.1-1,
Ex.F at 1. It limits the size of these buildings not on the basis
of their religious affiliation but on the basis of their location
and acreage. For example, if a plot of land fronts a state
highway, the owner can build a larger facility, in part
because the state highway can handle the traffic demands of
that facility; smaller plots that front only a county highway
are more limited and must build a smaller facility. Similarly,
the allegedly "discretionary special use process," Appel-
lant's Br. at 45, is justified by the secular goal of facilitating
municipal control of property uses that have a greater
"impact . . . upon neighboring lands," Zoning Regulations
§ 5-11-6(A), R.99, Ex.2. The secular nature of the special use
standards is made evident by the Zoning Regulations
themselves: They apply not only to "churches," but also to
those property uses that "may give rise to unique problems
with respect to their impact on neighboring property or
public facilities," *id.* § 5-11-6(A)(2), including among other
things "[s]chools," "[s]helters . . . for school bus transporta-
tion" and "[r]ecreational clubs," *id.* § 5-4-2-2(A), (B), (E).

Second, the land use regulations challenged by Vision do
not have a primary effect of advancing or inhibiting reli-
gion, or, more specifically, advancing established churches

over new churches. "In this prong, our focus is not on the intent of the City, but on whether a reasonable person, apprised of the circumstances surrounding the sale, would conclude that the sale amounted to an endorsement of religion." *Mercier*, 395 F.3d at 705. The primary question is "whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Books v. City of Elkhart,* 235 F.3d 292, 302 (7th Cir. 2000) (internal quotation marks omitted).

We believe that a reasonable person would understand the effect of the Assembly Ordinance and special use requirements to be a limitation on Village development generally, not on religion specifically. Notably, Vision does not refute the claim that new churches *are* permissible under the Village's zoning ordinances; they, like other public assembly buildings, merely must abide by the size and capacity limitations set forth in the Assembly Ordinance and, like other special uses, comply with the procedures set forth in § 5-11-6 of the Zoning Regulations. Nor does Vision make a compelling argument that these limitations are so unreasonable as to demonstrate a First Amendment violation. Although Vision requested in 2002 that the Board vote on its plans for a 99,000-square foot facility, it previously had prepared plans for a 56,200-square foot facility, which is only 1,200 square feet larger than the largest church facility allowable under the Assembly Ordinance. According to the record before us, a 55,000-square foot facility would fulfill the needs of Vision's 120-member (albeit growing) congregation: Under its 56,200-square foot plan, Vision's facility would have consisted of three main buildings and a 600-seat sanctuary, and was estimated to be able to serve a

congregation of between 800 and 1,000 persons.[15] In sum, Vision—and other new churches—reasonably and without hardship could operate within the size and capacity restrictions imposed by the Village; we therefore conclude that the Ordinance does not have a primary effect of advancing or inhibiting religion.

The same is true of the standards governing the issuance of a special use permit. Vision does not contend that, had it met the size limitations imposed by the Assembly Ordinance, it would have been denied a special use permit because of the balancing of factors under § 5-11-6 of the Village's Zoning Regulations. Nor can it cite an example of a church denied a special use permit, when it already had fulfilled the requirements imposed by the ordinance. Further, Vision fails to establish that the requirements imposed on "new churches" are unreasonable or otherwise impermissible: Indeed, to accept Vision's position would be to hold that a municipality could *never* change its zoning regulations with the effect of mandating that new churches, and other institutions, fulfill requirements not imposed on churches previously constructed—a position we simply cannot accept. Given that the zoning requirements are applied equally to secular and religious institutions alike and permit the construction of both institutions under certain, limited circumstances, we believe that "no reasonable person would believe that [the effect of the zoning ordinances] was to advance religion." *Mercier*, 395 F.3d at 705.

We now turn to *Lemon*'s third factor, whether the municipality has entangled itself excessively with religion. Vision

---

[15] *See also* discussion *infra* at 42 (discussing whether, in the context of RLUIPA § 2(a)(1), these limitations are reasonable).

contends that the Village has become involved intimately in the religious exercise of its churches, including the "size and aesthetics of their worship facilities, the hours of operation, and the scheduling of religious activities." Appellant's Br. at 45. To be sure, the Village's Plan Commission, during early negotiations with Vision over voluntary annexation, requested that Vision consent to a number of conditions on construction, including limitations on the future develop-ment of church facilities and on the number and scope of religious activities. *See* R.98, Ex.14 at 2 (requesting that Vision restrict "outside activities" in the playing field); *id.* (requesting that Vision agree to hold "[o]nly two services Sunday or holidays excepting weddings and funerals. And no more than one major activity each week Monday through Friday, excepting weddings and funerals").[16]

---

[16] It cannot be argued plausibly that these conditions, which are applications of a municipal policy, are not "laws" or legislative actions within the scope of the Establishment Clause. The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This constitutional provision has been applied to the states through the Fourteenth Amendment and has been interpreted as "imposing . . . substantive limitations on the legislative power of the States and their political subdivisions." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000). However, although the conditions requested by the Village and rejected by Vision do not involve the exercise of the municipality's "legislative power" per se, *id.*, but rather more fairly are classified as the interpretation by the municipality of policies already enacted by its legislative body, the scope of the Establishment Clause has been interpreted broadly by the Supreme Court and the courts of appeals. For example, in *Allegheny County v. ACLU*, 492 U.S. 573, 612 (1989), the Supreme Court held unconstitutional the placement of a

(continued...)

However, to establish excessive entanglement with religion, Vision must demonstrate "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 393 (1990) (internal quotation marks omitted). This inquiry requires examination of "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id.* (internal quotation marks omitted). Moreover, the advancement or inhibition of religion must be more than de minimis. *See Tanford v. Brand,* 104 F.3d 982, 986 (7th Cir. 1997). The general rule is that, to constitute excessive entanglement, the government action must involve

---

[16] (...continued)
crèche in the lobby of a courthouse, even though this conduct did not involve the exercise of legislative authority and did not even "command or prohibit conduct," *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) (discussing *Allegheny County*). *See Allegheny County*, 492 U.S. at 612 ("To be sure, some Christians may wish to see the government proclaim its allegiance to Christianity in a religious celebration of Christmas, but the Constitution does not permit the gratification of that desire, which would contradict the logic of secular liberty it is the purpose of the Establishment Clause to protect." (internal citations and quotation marks omitted)). The same is true of *Lee v. Weisman,* 505 U.S. 577 (1992), in which the Supreme Court held that, "[a] school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." *Id.* at 587. In sum, under these precedents, so long as the conduct is "attributed to" the government entity or municipality, *id.,* it is subject to the constitutional limitations of the Establishment Clause.

"intrusive government participation in, supervision of, or inquiry into religious affairs." *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 631 (7th Cir. 2000) (discussing the taxation of religious institutions).

We cannot conclude that the conditions on construction requested by the Village in the course of negotiations over annexation with Vision rise to the level of excessive entanglement. First, the condition limiting future development is wholly secular in nature and consistent with the goals of maximizing open space and limiting Village development set forth in the Comprehensive Plan. Notably, a similar agreement was required of the public elementary schools built across the street from Vision's property, as a condition of annexation and a special use permit. Second, the condition limiting use of the outdoor area on Vision's plans marked "playing fields" also is secular in nature. Members of the Plan Commission expressed concern that this land, if unrestricted, would be used for "carnivals or similar activities"; they instead wanted the land, consistent with the general goals of maximizing the ratio of development to open space in the Village, to remain "permanently unbuildable," such that it would "mirror the Fields of Long Grove," a large open area on the other side of the road. R.98, Ex.11 at 2. These neutral concerns do not impermissibly involve the municipality in the religious affairs.

The third condition—the request that Vision limit its Sunday services to two, excepting weddings and funerals, and limit its "major activit[ies]" during the week to one per week—could be somewhat more problematic. *See Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 702 (7th Cir. 2003). However, in its meetings discussing these conditions, the Commission defined a "major activity" as a non-"religious event[]" that "anticipate[s] [the] use[] of

more than 50 percent of the parking spaces." R.98, Ex.11 at 3. Reading the record as a whole, it appears that the Commission's primary concern was traffic control, rather than controlling the congregation's religious worship. In any event, the issue is not ripe for extended analysis. These conditions were raised by the Village during late 2000 negotiations over annexation; they were not raised again after the involuntary annexation of Vision's property in proceedings related to Vision's application for a special use permit in 2002. If this matter were to arise again in proceedings related to Vision's next application for a special use permit, the Church of course would be free to raise the issue anew.

## C.  Free Exercise of Religion

Vision also contends that the district court erred in dismissing its free exercise of religion claims under the First Amendment and RLUIPA. The district court held that the Village had not imposed any restriction on Vision's practices or beliefs; Vision now responds that "a number of the Village's actions" nevertheless "constitute a substantial burden [on the exercise of religion] by causing delay, uncertainty and expense." Appellant's Br. at 21 (internal quotation marks omitted).

"Under the Free Exercise Clause of the First Amendment of the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment, no law may prohibit the free exercise of religion." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762-63 (7th Cir. 2003) (hereinafter "*CLUB*"). The Free Exercise Clause, the Supreme Court has noted, "withdraws from legislative power, state and federal, the exertion of any

restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Jimmy Swaggart Ministries,* 493 U.S. at 384 (internal quotation marks omitted). The relevant inquiry is two-fold. First, we examine whether the law being challenged is "neutral and of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). If not, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32. This does not end the inquiry, however: "[A] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion," in which case there must be "a compelling governmental interest justif[ying] the burden." *Jimmy Swaggart Ministries*, 493 U.S. at 384-85 (internal quotation marks omitted).

The protections embodied by the Free Exercise Clause were codified in RLUIPA § 2(a)(1), which prohibits the government from

> impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Simply put, both the Free Exercise Clause and RLUIPA provide that, if a facially-neutral law or

land use regulation imposes a substantial burden on religion, it is subject to strict scrutiny.

Given the similarities between RLUIPA § 2(a)(1) and First Amendment jurisprudence, we collapse Vision's claims for the purpose of this analysis; this approach seems most consistent with post-RLUIPA case law.[17] Our sister circuits have defined RLUIPA's substantial burden provision by reference to the Supreme Court's free exercise jurisprudence, finding this case law to be "instructive in determining what Congress understood 'substantial burden' to mean in RLUIPA*." Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004); *see also Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006). Similarly, RLUIPA's legislative history indicates that the term "substantial burden" was intended to be interpreted by reference to First Amendment jurisprudence:

> The Act does not include a definition of the term "substantial burden" because it is not the intent of this Act to create a new standard for the definition of "substantial burden" on religious exercise. Instead, that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence. . . . The term "substantial burden" as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise.

146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Senators Hatch and Kennedy).

---

[17] Regardless, Vision's arguments on both legal theories are the same. *See* Appellant's Br. at 21-29.

Interpreting RLUIPA, we have held that a land use regulation imposes a "substantial burden" on religious exercise if it "necessarily bears direct, primary, and funda-mental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable." *CLUB,* 342 F.3d at 761. Similarly, interpreting the First Amendment, the Supreme Court has found a "substantial burden" to exist when the government put "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 141 (1987) (internal quotation marks omitted).[18] With this analytical framework in mind, we now turn to Vision's specific arguments.

Vision's primary arguments on appeal are that it was "substantially burdened" by (1) the involuntarily annex-ation of its property, which it claims was done with the intent to "thwart Vision's church," Appellant's Br. at 24; (2) the Village's conditions on annexation; and (3) the passage

---

[18] This definition has received further definition by the lower federal courts. *See, e.g.*, *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 988-89 (9th Cir. 2006) ("[F]or a land use regulation to impose a substantial burden, it must be oppressive to a significantly great extent. That is, a substantial burden on religious exercise must impose a significantly great restriction or onus upon such exercise." (internal quotation marks omitted; alteration in original)); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("We have held that an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion.").

of the Assembly Ordinance.[19]

Vision's claim as it relates to involuntary annexation does not state a valid cause of action under RLUIPA § 2(a)(1). That section forbids a government agency to "impose or implement a *land use regulation* in a manner that imposes a substantial burden on the religious exercise of a person," 42 U.S.C. § 2000cc(a)(1) (emphasis added); "land use regulation," in turn, has been defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land," 42 U.S.C. § 2000cc-5(5). "Under this definition, a government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." *Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir. 2002). The process of annexation, whether voluntary under 65 ILCS 5/7-1-8 or involuntary under 65 ILCS 5/7-1-13, may indeed make possible the subsequent zoning or marking of the

---

[19] Vision makes two additional claims. First, it contends that the differential treatment of it and the public schools across the street constitutes a "substantial burden" on its religious exercise. Appellant's Br. at 23. This claim more appropriately is addressed in the context of Vision's equal protection and RLUIPA equal treatment claims. *See infra.* Second, Vision discusses extensively the uncertainty and expense caused by the zoning and approval process. We recognize that Vision purchased its land in 1999 and, seven years later, still is seeking permission to build on the land. However, we remind the plaintiff that "the federal courts are ordinarily not vehicles to review zoning board decisions," and, in the absence of evidence tying the Board's actions to intentional discrimination, we decline to overturn the Board's decision on this basis. *Harding v. County of Door*, 870 F.2d 430, 432 (7th Cir. 1989).

land; however, an annexation statute is not itself a "zoning" or "landmarking" regulation and its application therefore does not constitute government action covered by RLUIPA.

We cannot conclude that either the Village's denial of Vision's application for annexation or its subsequent involuntary annexation of Vision's land constitutes a violation of the Free Exercise Clause of the First Amendment. As we noted in *CLUB*, "no Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest." *CLUB*, 342 F.3d at 763; *Midrash Sephardi*, 366 F.3d at 1227 ("[W]e agree that 'substantial burden' requires something more than an incidental effect on religious exercise.").

In this case, both annexation statutes are wholly neutral and apply generally to all property owners seeking annexation and to all persons owning property bounded on all sides by property within the municipality. *See* 65 ILCS 5/7-1-8, 13. To be sure, the Village admits that, in invoking its powers under 65 ILCS 5/7-1-13, it sought to control the future development of Vision's property; but there is no evidence that Village desired such control *because* Vision is a *religious* institution or a religious institution of a certain denomination. Nor is there evidence that the effects of the Village's actions were anything more than incidental: The record evidence indicates that it is not because of the denial of the 2000 application for annexation or because of the 2001 involuntary annexation that Vision's church currently is not being constructed; rather, it is because of Vision's refusal to abide by the size restrictions imposed by the Assembly Ordinance that it later was denied a special use permit to construct a church on its land.

Vision next alleges that the Village improperly imposed conditions on its annexation and approval for a special use permit. This claim is covered by both RLUIPA and by the First Amendment Free Exercise Clause.[20] However, as we explained in the context of the Establishment Clause, we ultimately conclude that these conditions—which included limitations on future development, on the use of a particular outdoor area, and on Sunday and weekly activities—are no more than incidental burdens on the exercise of religion. Our analysis in *CLUB* is instructive. There, we rejected the plaintiff's suggested interpretation of "substantial burden," holding that, under such an interpretation, "the slightest obstacle to religious exercise incidental to the regulation of land use—however minor the burden it were to im-pose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means." 342 F.3d at 761. Similarly, here, we find that the conditions on construction impose only a minor burden on Vision's operations: The first two conditions are neutral and traceable to municipal land planning goals. The latter condition, limiting activities at the church, is more trouble-some, as previously noted. However, a burden must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place "significant pressure" on Vision to "forego religious precepts" or to engage in "religious conduct." *Midrash Sephardi*, 366 F.3d at 1227.

---

[20] Vision's argument in effect challenges the application of municipal standards governing the approval of property for a special use, contained in § 5-11-6(D) of the Village Zoning Regulations; these standards are part of a "zoning law" covered by RLUIPA. The same is true of Vision's challenge to the constitu-tionality of the Assembly Ordinance, which amended the Village's Zoning Regulations.

Because there is no evidence that these conditions affected the Village's later decision to forcibly annex the property, to enact the Assembly Ordinance and ultimately to deny Vision's 2002 application for a special use permit, we cannot conclude on this record that Vision has demonstrated a substantial burden.[21] Notably, the record indicates that, had Vision complied with maximum size requirements imposed by the Public Assembly Ordinance, there likely would be a church complex currently being constructed, notwithstanding its rejection during earlier negotiations of limitations on future development, worship services and other institutional activities.

Lastly, we turn to Vision's contention that the enactment of the Assembly Ordinance constitutes a "substantial burden" on its right to the free exercise of religion. The Assembly Ordinance is facially neutral; it applies to the new construction of *all* public use buildings, regardless of their purpose, including not only "religious institutions," but also "aquariums, libraries, museums, private schools, and other similar uses," R.1-1, Ex.F at 1. According to Vision, despite its neutrality, the Ordinance was passed for the sole purpose of forcing Vision to reduce the size of its proposed complex, which, in turn, substantially burdens Vision's potential success. Besides temporal proximity between Vision's dispute with the Village over a special use permit and the enactment of the Ordinance, there is no evidence in the record to support this claim. Even if Vision was targeted by the Assembly Ordinance, this does not mean that it was targeted *because of religion*. The Plan Commission was concerned about the size of the church complex and its effect on the character of the Village, concerns separate and

---

[21] *See also* discussion *supra* at 33-34.

independent from the religious affiliation (or lack thereof) of the institution seeking to build on the land.

Moreover, there is no triable issue of fact with respect to whether the size, capacity and other restrictions imposed by the Ordinance constitute a non-incidental, substantial burden on the exercise of religion. Under the ordinance, Vision would be permitted to build a 55,000-square foot facility. As mentioned previously,[22] experts estimate that a facility of this size would be able to meet the needs of an 800 to 1,000 member congregation.[23] Vision currently has 120 members. Although we recognize that Vision plans to grow in size, we cannot fathom a situation in which limiting the church to a three-building, 55,000-square foot facility would impose an unreasonable and substantial burden on religious exercise; the congregation would have to increase eight-fold to reach its maximum capacity. Notably, the second set of plans proposed by Vision in the course of early negotiations totaled 56,200 square feet and consisted of three main buildings (a sanctuary, an administration building and a Sunday school building), a 600-seat sanctuary, and 240 parking spaces. Unlike in *New Berlin*, where the Appellant would have been required to find "[an]other parcel of land on which it could build its church,*" City of New Berlin*, 396

---

[22] *See supra* at 29.

[23] Specifically, Vision's expert estimated that a 40,000-square foot facility would accommodate a congregation with an average Sunday worship attendance of 500; in turn, average worship attendance typically is 60-80% of the total membership. Vision's expert further estimated that a facility of 75,000 square feet would be appropriate for a church with an average worship attendance of 1,000, and a membership of 1,250 to 1,600 people.

F.3d at 899, in this case, Vision was free to submit modified plans to the Board that could have "cure[d] the problems and deficiencies cited by the Board," *Westchester Day Sch. v. Vill. of Mamaroneck,* 386 F.3d 183, 188 (2d Cir. 2004) (finding no "substantial burden" where this same opportunity was available to the plaintiff).

## D.  Equal Protection

We next address Vision's claim that the district court erred in dismissing its equal protection claims under the Fourteenth Amendment Equal Protection Clause and RLUIPA's equal terms provision. Vision contends that the Village "applied its laws to treat Vision differently from other assembly uses similarly situated or prima facie identical in all relevant respects." Appellant's Br. at 42. Specifically, Vision argues that it was treated less favorably than "restaurants, tearooms, taverns and health clubs," which are permitted uses in some zones, while churches are not permitted uses in any zone, *id.*; further, Vision contends that it was treated less favorably than the "schools just across [the] road from Vision's property" because, although they submitted identical petitions for a special use permit, the school's application was granted and Vision's was denied, *id.*  Because the legal framework for analyzing Vision's Fourteenth Amendment and RLUIPA claims differ, we address each in turn.

### 1.  Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amend-ment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, which essentially is a direction that all

persons similarly situated should be treated alike, *Plyler v. Doe,* 457 U.S. 202, 216 (1982). If a statute or municipal ordinance classifies by race, alienage, or national origin, we subject the legislative action to "strict scrutiny and [it] will be sustained only if [it is] suitably tailored to serve a compelling state interest"; "[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Heightened scrutiny also is appropriate when government action interferes with a person's fundamental rights, such as freedom of speech or religion. *See Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002). If "no suspect class or fundamental right is involved," however, "we employ a rational basis test to determine whether the legislative act is constitutional." *Id.*

The municipal ordinances challenged by Vision do not classify on the basis of race, alienage or national origin. Further, as we conclude above, the Village's Zoning Regulations and the Public Assembly Ordinance do not discriminate on the basis of religion. We therefore apply only rational basis scrutiny to Vision's equal protection claims. *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (holding that, where the challenged government action did not constitute a "violation of the Free Exercise Clause," only "rational-basis scrutiny" was warranted). In other words, Vision must demonstrate "governmental action wholly impossible to relate to legitimate governmental objectives." *Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004) (internal quotation marks omitted). In pertinent part, to meet this standard, Vision must demonstrate "malicious conduct" on the part of government officials, or "conduct that evidences a spiteful effort to 'get' him for reasons wholly unrelated to any

legitimate state objective." *Id.* at 573 (internal quotation marks omitted).

This Vision cannot do. Vision points out that the Village's Zoning Regulations classify "restaurants, tearooms, taverns and health clubs" as permissible uses in business districts, while churches require a special use permit in residential districts. But, like churches, schools also are not permissible uses in residential districts, demonstrating that the distinction between permissible and special uses is not rooted in animosity towards religious institutions. *See* Zoning Regulations § 5-4-2-2, R.99, Ex.2. Further, the distinction can be traced to legitimate municipal land planning goals. The special uses in residential districts identified by the Zoning Regulations (i.e., schools, churches and recreational clubs) and the special uses in business districts (i.e., restaurant patios) raise unique concerns such as traffic control, noise pollution, and a greater impact on the landscape than more common uses. As the Third Circuit observed, "a municipality may chart out a quiet place where yards are wide, people few, and motor vehicles restricted[.] [These] are legitimate guidelines in a land-use project addressed to family needs." *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 135 (3d Cir. 2002) (internal quotation marks omitted). Given these justifications for differential treatment, we cannot conclude that municipal officials acted "malicious[ly]" or irrationally. *Patel,* 383 F.3d at 573.

Vision also suggests that it was irrational for the Village to deny its application for annexation and a special use permit, while granting an identical application in July 1999 from Kildeer School District for the annexation of land and permission to build public elementary schools across the street from Vision's property. We cannot characterize

these decisions as "wholly impossible to relate to legitimate governmental objectives." *Id.* at 572. Public schools serve a unique public function, and, given the discretion municipalities enjoy over annexation, *see Barefoot v. City of Wilmington*, 306 F.3d 113, 121 (4th Cir. 2002), it certainly was not irrational for the Village to want the School District's land to be within its municipal boundaries for the purpose of serving its students. Further, conditions on construction similar to those imposed on Vision, including a limitation on future development, were placed on the School District. *See* R.100, Ex.41 at 7-8. While Vision resisted the Village's request, the School District willingly agreed. In light of these considerations, approving the annexation of the School District's property while denying the annexation of Vision's property was not irrational. The same is true of the denial of Vision's special use application in 2002:[24] At the time that Village addressed Vision's special use application, it already had passed the Assembly Ordinance, imposing size and capacity limitations on the construction of a building used for public assembly. To deny Vision's application because it failed to submit plans that complied with these restrictions is rationally related to the goals reflected in the Assembly Ordinance.

---

[24] Vision compares its application for a special use permit in 2000 to the elementary school's similar application in July 1999. However, because Vision's application for annexation was denied by the Village in 2000, the Village did not have jurisdiction to grant or deny the special use permit; it never addressed or took action on this application. Thus, for the purpose of the above analysis, we consider only whether the Village's denial of Vision's 2002 application for a special use permit lacked rational basis.

Vision also raises a "class of one" equal protection claim. "We ha[ve] recognized equal protection claims brought by a 'class of one,' although we have acknowledged that it is difficult to succeed with such a claim." *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 969 (7th Cir. 2006) (internal quotation marks omitted; alteration in original). To establish a "class of one" claim, Vision must show that: "(1) it has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a totally illegitimate animus toward [Vision]." *Id.* at 970 (internal quotation marks omitted).

Vision cannot show that it was treated less favorably than an institution similarly situated. "[R]estaurants, tearooms, taverns and health clubs," Appellant's Br. at 42, are not similarly situated: They are permitted uses in the Village's *business district*; by contrast, the church is zoned "Residential." The apt comparison would be to "[s]ingle-family detached dwellings" and "[a]gricultural operations," which are "permitted uses" in residential districts, *see* Zoning Regulations § 5-4-2-1, R.99, Ex.2, but Vision fails to make this comparison. Vision also is not similarly situated to the two elementary schools operated by the Kildeer School District. In evaluating the requests for a special use permit, Vision and the schools both were subject to the inquiry mandated by § 5-11-6(D) of the Zoning Regulations, which examines whether the special use "is deemed necessary for the public convenience" and will "protect[]" "public health, safety and welfare." *Id.* § 5-11-6(D). In July 1999, this issue was the sole inquiry mandated by the Zoning Regulations, and the Village determined that the schools were appropriate special uses. When the Village considered

Vision's application for a special use permit in May 2002,[25] however, these standards had changed slightly: To obtain a special use permit, Vision also needed to comply with the size and capacity restrictions imposed by the Assembly Ordinance, which had been passed by the Village Board the month prior. Because the prevailing standards for granting a special use permit in 1999 and in 2002 differed, we cannot find Vision to be similarly situated to the schools for the purpose of class of one analysis.

### 2.  RLUIPA Equal Terms

"For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is 'similarly situated' to the other, as in our familiar equal protection jurisprudence." *Konikov v. Orange County*, 410 F.3d 1317, 1324 (11th Cir. 2005). Instead, the pertinent question is whether the "land use regulation . . . treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Although this court has not yet had an opportunity to explore fully the contours of RLUIPA's equal terms provision, the Eleventh Circuit recently set forth comprehensively what it described as the

> three distinct kinds of Equal Terms statutory violations: (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially

---

[25] *See supra* note 24 (limiting the court's analysis to the rejection of Vision's 2002 special use application, and explaining that the Village never acted on Vision's earlier request for a special use permit because it lacked jurisdiction over Vision's property).

neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions.

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1308 (11th Cir. 2006) (hereinafter "*Primera*").

With respect to RLUIPA § 2(b)(1), Vision challenges only the special use permit requirements; it does not claim that the Assembly Ordinance also violates the statute. But the Zoning Regulations, particularly the section addressing special uses, does not "differentiate[] between religious and nonreligious assemblies or institutions." *Id.* Nor does the facially neutral ordinance nevertheless target religion through religious "gerrymander[ing]." *Id.* Lastly, we cannot find that the special use requirements were "selectively enforced" against Vision Church, such that Vision was treated less favorably than another, non-religious institution. As explained above, the comparison between Vision and the restaurants and tearooms that are considered permitted uses in the business district is not persuasive. Further, although under RLUIPA § 2(b)(1) a plaintiff need not demonstrate disparate treatment between two institutions similarly situated in all relevant respects, as required under equal protection jurisdiction, the fact that Vision and the elementary schools were subject to different standards because of the year in which their special use applications were considered compels the conclusion that there was no unequal treatment. *Cf. id.* at 1310 ("[T]he School is simply not a valid comparator here because the rezoning process is an entirely different form of

relief from obtaining a variance." (internal quotation marks omitted)).

## E.  State Law Supplemental Claims

Vision argues that, as a matter of state law, the Village arbitrarily and without reference to defensible standards rejected its 2002[26] application for a special use permit. We cannot accept this argument. Vision focuses in its brief on the special use standards set forth in § 5-11-6(D) of the Zoning Regulations. Specifically, Vision claims that it "satisfied all the criteria necessary for issuance of a [permit]," Appellant's Br. at 35; it also challenges the special use regulations as lacking "defensible standards," *id.* at 37 (internal quotation marks omitted). Even if this were true, however, Vision was not denied a special use permit on the ground that the church would "cause substantial injury" to neighboring properties or that it otherwise was not "necessary for the public convenience," or because it failed to meet another criteria set forth in the Zoning Regulations. Zoning Regulations § 5-11-6(D), R.99, Ex.2. Rather, the permit was denied because Vision had submitted plans for the construction of a 99,000-square foot facility, which is 44,000 square feet larger than that allowed under the Public Assembly Ordinance. We already have determined that this legislation is constitutional, and there is no evidence that its application to Vision was arbitrary or capricious.

---

[26] As in the context of Vision's equal protection claims, we limit our consideration of Vision's claims to the Village's denial of Vision's application for a special use permit in May 2002. *See supra* notes 24-25.

Vision also claims that the district court erred in granting summary judgment to the Village on its state law vested rights claim. The district court held that, even if Vision had fulfilled the elements of a vested rights claim, the proper course of action was to sue Lake County, not the Village; further, it found that Vision could not "establish that there was a probability of municipal approval to build a church complex on its property." R.157 at 27.

We understand why Vision has directed its claim at the Village rather than the County. Its argument proceeds as follows: It had a right, when it purchased the property, to construct a church under Lake County Zoning Code; it relied on this right in purchasing the property; upon involuntary annexation by the Village, *see* 65 ILCS 5/7-1-13, this right was taken away because the property no longer was subject to Lake County's zoning jurisdiction; therefore, the Village is required to allow Vision to "complete the construction and [to] use the premises for the purposes originally authorized." Appellant's Br. at 30 (internal quotation marks omitted).

Nevertheless, Vision has not established a valid vested rights claim under Illinois law. Illinois courts generally recognize that "there is no vested right in the continuation of a zoning classification." *Furniture L.L.C. v. City of Chicago*, 818 N.E.2d 839, 843 (Ill. App. Ct. 2004). However, the Illinois Supreme Court has held:

> [W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes

originally authorized, irrespective of subsequent zoning
or a change in zoning classifications.

*Pioneer Trust & Savings Bank v. Cook County*, 377 N.E.2d 21,
26 (Ill. 1978) (internal quotation marks omitted). As a result,
Illinois courts have found that, where a plaintiff purchases
and invests in property believing in good faith that it will
receive a building permit, the city cannot amend zoning
classifications to the builder's detriment, making unavail-
able the intended use of the land. *See, e.g., Furniture L.L.C.*,
818 N.E.2d at 846.

However, there is no Illinois case law applying the
vested rights doctrine under the present circumstances—
where a plaintiff has relied to its detriment on a county
zoning ordinance, but sued *a different* government entity, the
municipality, for the disruption of this expectation. As a
federal court exercising supplemental jurisdiction over this
claim, we must be reluctant "to expand state law" in this
fashion. *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1034
(7th Cir. 2005).[27] Moreover, to expand Illinois law to create
a remedy in this case would render 65 ILCS 5/7-1-13
meaningless. Title 65 ILCS 5/7-1-13 sets forth the limited
conditions under which involuntary annexation is permissi-
ble; because Vision's property is bordered on all sides by
property within the Village's corporate boundaries, the
Village was authorized to involuntarily annex the property
under the terms of the statute. Under Vision's proposed
rule, the Village—and all other Illinois
municipalities—effectively would be stripped of the author-

---

[27] *Cf. Dausch v. Rykse,* 52 F.3d 1425, 1438 (7th Cir. 1994) (Ripple,
J., concurring) ("[F]ederal courts sitting in diversity ought to
be circumspect in expanding the law of a state beyond the
boundaries established in the jurisprudence of the state.").

ity to annex *any* land that already is zoned for development under county zoning code, contrary to the obvious intent of the Illinois state legislature. *See also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 586-87 (7th Cir. 2002) (noting that "our task is to implement state law as state courts would implement it" and holding that, if we believe that state courts would find a "conflict" between the interpretation urged by the parties and a state statute, that interpretation must be invalidated). Because we believe that an Illinois state court would not interpret a common law doctrine in a manner that neutralizes the meaning of a state statute, we cannot adopt the interpretation of the vested rights doctrine advanced by Vision.

## Conclusion

For the reasons set forth in the foregoing opinion, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—11-7-06